**FORD MOTOR COMPANY, Plaintiff,**

v.

**UNITED STATES, Defendant.**

Slip Op. 97–121.
Court No. 92–03–00164.

United States Court of
International Trade.

Aug. 29, 1997.

See also, 896 F.Supp. 1224.

Stein, Shostak, Shostak & O'Hara (S. Richard Shostak); Ford Motor Company (C. Harry Gibson), for plaintiff.

Frank W. Hunger, Assistant Attorney General of the United States; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, A. David Lafer, Senior Trial Counsel, (Michael S. Kane); Joseph I. Liebman, Attorney in Charge, International Trade Field Office (Amy M. Rubin); Sheryl French, Attorney–Advisor, Office of the Assistant Chief Counsel, United States Customs Service, of counsel, for defendant.

## OPINION

CARMAN, Chief Judge.

Before this Court are cross-motions for summary judgment pursuant to U.S. CIT R. 56 regarding the assessment of duties by the United States Customs Service ("Customs") at the rate of twenty-five percent *ad valorem* under Items 692.02 and 945.60 of the Tariff Schedules of the United States ("TSUS")[1] on certain engines and transmissions imported and installed by plaintiff Ford Motor Company ("Ford") in trucks in a Foreign Trade Subzone ("FTSZ" or "FTZ"). The trucks were entered in eleven consumption entries, which were filed at the Port of Louisville by Ford as importer of record between December 30, 1985 and February 7, 1986. This Court has jurisdiction pursuant to 28 U.S.C. § 1581(a) (1988).

## BACKGROUND

### A. *Louisville Foreign Trade Subzone*

In the early 1980's, Ford announced plans to operate in a FTSZ in Louisville, Kentucky, which would encompass a motor vehicle assembly plant it operated there, to assemble imported engines and transmissions into both

trucks and automobiles. In its Louisville plant, Ford assembled both passenger cars (Bronco II's) as well as trucks (Rangers) using the same assembly line, but the duty rates corresponding to the completed cars and trucks were different. Ford's rationale for operating in the Louisville FTSZ was to take advantage of Customs laws and regulations that would enable Ford to minimize the duties paid on imported engines and transmissions assembled into both cars and trucks.

The existing duty rate in 1985–86 for completed passenger cars was 2.6% *ad valorem* under Item 692.10, TSUS. The existing duty rate at that time for imported engines and transmissions was 3.3% *ad valorem* under Item 660.48, TSUS for engines and under Item 692.32, TSUS for transmissions. The existing duty rate in 1985–86 for completed trucks was 25% *ad valorem* under Item 945.69, TSUS.

With respect to cars assembled in the FTSZ, the duty rate applicable to completed cars in which imported engines and transmissions were assembled was lower than the duty rate applicable to the imported engines and transmissions entered as parts. In order to take advantage of the lower rate applicable to completed cars, Ford had to select "Non–Privileged Foreign" ("NPF") status on the Customs 214 Forms when the engines and transmissions to be assembled into cars entered the FTSZ. When "NPF" status was selected for these engines and transmissions, Ford would not pay duties on the entered parts until they were assembled into completed cars. Thus, Ford had an incentive to enter engines and transmissions destined for cars in "NPF" status.

In contrast, the duty rate applicable to completed trucks was substantially higher than the duty rate applicable to engines and transmissions for trucks which were entered as parts. Because a single assembly line located in Ford's Louisville FTSZ operation produced both completed cars and trucks simultaneously using the same imported parts, Ford had to claim "NPF" status for

---

1. The Tariff Schedules cited in this opinion are those applicable to entries made in the years 1985–1986.

the engines and transmissions to be assembled into completed cars, while simultaneously ensuring the engines and transmissions for trucks were not placed in "NPF" status. Rather, Ford intended to select "Privileged Domestic" ("PD") status for the engines and transmissions which entered the FTSZ destined for use in trucks. By selecting "PD" status, Ford could pay the lower component duty rate up front before the engines and transmissions entered the FTSZ and thus reduce somewhat the duties on the finished truck. The imported engines and transmissions assembled into finished trucks in the FTSZ would be assessed lower duties corresponding to the parts rate when they were entered into the commerce of the United States, enabling Ford to avoid paying duties at a higher rate when the completed trucks entered the United States. Engines and transmissions which entered the Louisville FTSZ in "PD" status were thus non-dutiable because all duties had been paid on these parts upon their entry into the United States and before they entered the FTSZ.[2]

Accordingly, in order to pay the lowest possible duty rate on the imported engines and transmissions, Ford had to claim "NPF" status for engines and transmissions assembled into completed cars, which had a lower duty rate than for unassembled parts, while simultaneously ensuring that engines and transmissions assembled into completed trucks were not placed in "NPF status," which would make them dutiable at a higher rate for finished trucks. Ford intended to enter the engines and transmissions for trucks in "PD" status. Under these circumstances, the operation of the FTSZ was a complicated venture.

In late 1984, prior to activating the FTSZ, Ford appointed Mr. Moe Tullock as the FTSZ Coordinator or Agent at Louisville. Mr. Tullock was instructed that when foreign

transmissions and engines for use in manufacturing trucks were entered into the FTSZ, he was to pay duties on the parts *before* they entered the FTSZ at the 3.3% *ad valorem* rate applicable to transmissions and engines, and thereafter designate the entries as "PD" on the Customs 214 Forms. (*See* Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Br.") at 8.) This treatment made it possible to avoid paying the 25% *ad valorem* rate when the parts left the FTSZ and entered the United States in completed trucks. Instead, when the completed trucks left the FTSZ, having already paid duties on the engines and transmissions, Ford would be entitled to enter the engines and transmissions duty-free. Mr. Tullock was similarly instructed that with respect to parts to be used in the assembly of automobiles, he was to declare them as "NPF" and pay no duty on them until they left the FTSZ incorporated in completed cars. At that point, the parts would be dutiable at the 2.6% *ad valorem* rate applicable to finished automobiles.

Under Customs regulations, an importer was required to separately maintain both "NPF" and "PD" merchandise located within the FTSZ, and Ford was responsible for ensuring that it remained in compliance with applicable United States Customs requirements and regulations. Customs advised Ford to keep domestic and imported parts separate and to maintain inventory records tracking all parts that entered the FTSZ, especially tracking those parts Ford paid duty on and those it did not. Before the initiation of operations in the FTSZ, Ford proposed an inventory control methodology using the "first-in-first-out" system, but this proposal was rejected by Customs.

**B.  *Eleven Entries Made Between December 1985 and February 1986***

In the beginning of January 1986, Mr. Tullock experienced difficulty with his super-

---

**2.** Alternatively, Ford could have obtained the lower component duty rate when the finished trucks left the FTSZ by selecting "Privileged Foreign Status" ("PFS") on the Customs 214 Forms for the engines and transmissions. Defendant indicates, however, "PFS" was impracticable for Ford and, as a matter of policy, Ford did not use "PFS" status. (Def.'s Mot. for Summ. J. ("Def.'s Br.") at 5 n. 3 (*citing* Anderson Dep. at 136–38, 207–08).) With respect to the entries at issue,

Ford explained "Mr. Tullock was instructed *in no uncertain terms* that when foreign transmissions and engines to be used in trucks were to be entered into the FTSZ, he was to pay duties on them, before they entered the FTSZ, at the 3.3% *ad. val.* duty rate applicable to transmissions and engines. Thereafter he was to designate them as "Privileged Domestic" (PD) on the Customs 214 Forms." (Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Br.") at 8.)

vision of the FTSZ. He failed to pay duties on engines and transmissions to be incorporated into trucks before they entered the FTSZ and erroneously designated them as "NPF" on the Customs 214 Forms. The eleven entries at issue in this case were prepared by Mr. Tullock and filed with Customs during the period December 1985 through early February 1986. The entries at issue described the subject merchandise as "transmissions for trucks" or "engines for trucks" as opposed to completed trucks and entered the engines under TSUS 660.48 and the transmissions under TSUS 692.32 at a duty rate of 3.3% *ad valorem.* Duties were not paid on the parts before they entered the FTSZ, and the parts were designated as "NPF" instead of as "PD" on the Customs 214 Forms. The documents detailing the eleven entries were replete with errors, including incorrect product descriptions, duty rates and tariff item numbers. In his affidavit, Mr. Tullock testified that he suffers from a medical condition that resulted in a complete loss of memory with respect to the circumstances surrounding the entries. Mr. Tullock stated

> I have no explanation as to exactly how the wrong foreign trade zone status designation was placed on the form 214. I was aware that the intent of the operation was to pay a duty rate of 3.5% on parts used for Ranger production. I felt at the time I had been trained in the proper preparation of the documentation, and was unaware that documentation as submitted would fail to achieve this end.

> I first became aware of the wrong foreign-trade zone status designation on the CF 214 forms when Ford Dearborn Headquarters officials came to Louisville to assist me and identified the problem. Up until that time, I had believed that with the assistance of the local Customs officials and our Customhouse broker that all details of the operation has been handled appropriately.

(App. to Pl.'s Br. ("Pl.'s App.") Ex. 3 at 1–2.)

At some point in late January or early February 1986, Ford met with a Customs import specialist in Ohio and disclosed the errors made in entering the engines and transmissions into the Louisville FTSZ. Ford representatives requested the import specialist allow them to amend the entry documents, but the import specialist advised Ford such amendments were not permitted by the United States Customs laws and regulations. In mid-February 1986, Ford discontinued its operations in the Louisville FTSZ.

### C. *Liquidation and Protest*

The eleven entries subsequently were liquidated on December 1, 1989 with duties assessed at the rate of 25% *ad valorem.* Additional duties amounting to more than $5 million were assessed because Ford's election of "NPF" status for the truck parts imported in the entries resulted in the application of a 25% *ad valorem* rate for finished trucks under TSUS Items 692.02 and 945.69 for those parts instead of the 3.3% *ad valorem* duty rate on entered truck parts. Two of these entries were subsequently reliquidated in February 1990 to make minor corrections. Ford timely protested the liquidations and ultimately paid the additional duties assessed.

### D. *Extension Notices*

Customs claims it sent Ford and its surety a total of sixty-six Notices of Extension of Liquidation (three notices to Ford and three to its surety for each of the eleven entries, a total of thirty-three to each) in 1986, 1987 and 1988. Customs claims it sent all required notices to Ford and its surety, and its records show that the last of the extension notices in this case was mailed to Ford on or about October 22, 1988, two months before Ford's Customs Department moved to a new location. Customs cannot identify the person who mailed the notices and does not keep a hard copy of the notices or send them by registered or express mail.

The Chief of the Entry Control Processing Branch, a branch within the Commercial Systems Division of Customs, explained that Customs maintains a computerized database called the Automated Commercial System ("ACS"), which tracks and processes every Customs entry made, containing information with respect to each entry on matters such as liquidation, billing and payment of duties,

and extensions of the time to liquidate and suspension of liquidation. (*See* Declaration of Arthur Versich at 1 (*reprinted in* Def.'s App. at 172–77).) Mr. Versich explained that once data regarding an extension of liquidation is entered into ACS, the extension notice is automatically scheduled to be printed on the following weekend, as part of Customs' "end-of-week" processing, and notices of extension are formatted and printed by computer onto Customs Form 4333A. (*Id.* at 2.) Based on his knowledge of the notice system and his experience as a former import specialist, Mr. Versich concluded "that 66 notices were issued on an appropriate basis each time, and the notices were properly addressed and timely printed and mailed." (*Id.* at 4.) Additionally, Roger Odom, the Supervisor for Customs' Computer Operations and Production Management Section, who was responsible for computer operations at Customs' Data Center, explained that after the notices are printed and addressed by computer, they are removed by an operator and placed in plastic trays provided by the Postal Service, and are picked up by the Postal Service within twenty-four hours of printing. (*See* Declaration of Roger Odom at 4 (*reprinted in* Def.'s App. at 178–82).)

Ford and its surety deny ever receiving any of the sixty-six notices. A section supervisor of Ford's Customs Department testified in his deposition that an extensive two month search of all of Ford's customs records was undertaken in early 1990 to locate the notices, but none was found.

### E. Stay Pending Decision in Intercargo

Oral argument was held in this case in January 1995. This case, however, was subsequently stayed on the application of the plaintiff pending a final decision by the Court of Appeals for the Federal Circuit ("Federal Circuit") in *Intercargo Ins. Co. v. United States,* 879 F.Supp. 1338 (CIT 1995), *rev'd,* 83 F.3d 391 (Fed.Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 943, 136 L.Ed.2d 832 (1997) ("*Intercargo* "). Prior to this case being stayed, and six months after the parties filed cross Motions for Summary Judgment, Ford sought, and was granted, leave to amend its complaint to assert a claim that,

assuming the alleged notices of extension were sent to Ford and its surety, the language of the extension notices was statutorily inadequate. *See Ford Motor Company v. United States,* 896 F.Supp. 1224 (CIT 1995). Ford argued the language included in defendant's notices of extension of liquidation was the same standard generic language held to be invalid in *Intercargo* and therefore did not comply with the statutory requirements in 19 U.S.C. § 1504(b). After the Federal Circuit reversed *Intercargo,* the stay in this case continued, pending the United States Supreme Court's decision whether to grant certiorari on *Intercargo.* The Supreme Court denied certiorari in *Intercargo.*

Defendant asserts the Federal Circuit's *Intercargo* decision and the denial of certiorari by the Supreme Court effectively has mooted Ford's claim that the language contained in the notices extending the time for liquidation of its merchandise rendered the notices ineffective. Ford acknowledges its amended claim that the language of the extension notices alone made them "fatally flawed" has been mooted by *Intercargo.* However, Ford continues to maintain its argument the notices were invalid, asserting they were not obtained for a statutorily valid reason and therefore are not affected by the holding in *Intercargo.* After the Supreme Court denied certiorari, the parties requested, and this Court granted, an opportunity to address the impact of *Intercargo* and any other relevant cases that had been decided since this matter was stayed. The case is now before this Court for a decision.

### STANDARD OF REVIEW

This case is before the Court on cross-motions for summary judgment. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." U.S. CIT R. 56(d). "The Court will deny summary judgment if the parties present 'a dispute about a fact such that a reasonable trier of fact could return a verdict against the movant.' " *Ugg Interna-*

*tional, Inc. v. United States,* 17 CIT 79, 83, 813 F.Supp. 848, 852 (1993) (citation omitted). Both parties in this case agree there are no genuine issues of material fact which would prevent this Court from deciding this action on the basis of the pending motions for summary judgment. (Pl.'s Br. at 18; Def.'s Mot. for Summ. J. ("Def.'s Br.") at 1.) Because the issues remaining in this case are legal in nature, the Court concludes the parties' conflict raises questions of law which the Court may properly resolve by summary judgment. *See, e.g., Aviall of Texas v. United States,* 18 CIT 727, 729, 861 F.Supp. 100, 103 (1994).

## CONTENTIONS OF THE PARTIES

### A. *Plaintiff*

Ford argues its failure to pay duties on the imported transmissions and engines assembled into trucks before their entry into the Louisville FTSZ and the election of "NPF" status for these articles, rather than "PD" status on the Customs 214 Forms "were the result of 'clerical errors, mistakes of fact and/or other inadvertances,' which are correctable under 19 U.S.C. § 1520(c)(1)." (Pl.'s Br. at 3.) Ford also argues the sixty-six notices of extension of liquidation of the eleven entries "were never received by FORD or by its surety" and therefore the entries must be deemed liquidated " 'as entered' *as a matter of law,* long before December 1, 1989, when the Customs Service 'liquidated' them." (*Id.*) Under these circumstances, Ford maintains, the Court should hold the 1989 liquidations and their increased duty assessments are illegal, null and void. Finally, Ford contends the "alleged" extensions were also invalid and illegal "because the reasons for the extensions were never *specifically* disclosed to FORD, and, as now identified, they are not authorized by the statutes or by the regulations." (*Id.*)

### B. *Defendant*

Defendant argues even assuming Ford intended to enter the merchandise with "PD" status, "Ford cannot obtain relief pursuant to 19 U.S.C. § 1520(c)(1) because Ford's failure to pay duty on this merchandise prior to the entry of the merchandise into the FTZ amounted to an error in the 'construction of law.' " (Def.'s Br. at 15.) Defendant argues Ford did not comply with inventory control and record-keeping requirements applicable to "PD" merchandise and "[i]t would be perverse to allow Ford to obtain favorable treatment for which Ford would not be entitled even if Ford had properly completed the entries and [Customs 214 Forms]." (*Id.* at 16.)

Defendant asserts the two Ford employees[3] who supervised the initiation of the FTSZ operated under the fundamental misunderstanding that the engines and transmissions could not be used interchangeably to manufacture both cars and trucks, and therefore established an inventory reporting and control system that relied upon a supposed lack of interchangeability between engines and transmissions used in manufacturing cars and trucks. (*See id.* at 8 (*citing* Moody Dep. at 23–26, 33–34; Anderson Dep. at 241–242, 255).) Defendant further states Mr. Moody testified that if he had been aware that the imported engines and transmissions were used interchangeably to assemble trucks and cars, he would "not have been a party" to Ford's FTSZ operations at Louisville, a "program that [presented] the risk ... of a misusage of parts." (*Id.* at 9 (*citing* Moody Dep. at 25).) Defendant explains Mr. Moody also testified that the Louisville plant did not keep records of "PD" parts because he assumed "PD" parts did not enter the FTSZ. (*Id.* at 10 (*citing* Moody Dep. at 36–37, 42, 44–45, 73–73, 91).) Finally, defendant notes Mr. Anderson testified that he believed Mr. Tullock understood it was incorrect for Ford to enter "NPF" parts contained in a completed truck at the parts rate but nevertheless continued this practice. (*Id.* at 11 (*citing* Anderson Dep. at 127–131).)

Defendant additionally maintains Ford is unable to rebut the presumption it received the notices of extension. Defendant argues

---

**3.** The two Ford employees were Alan Moody and Lars Anderson. Lars Anderson was a Customs specialist at Ford's Dearborn headquarters. Alan Moody was supervisor of the Customs' unit and Mr. Anderson's supervisor.

there was no one individual responsible for maintaining Ford's files. Defendant adds

> [n]otices of extension received by Ford were maintained 'loose' in manila folders (along with other materials) in two file drawers contained in a file cabinet that was situated in a common hallway—and that remained unlocked during the day. Files could be removed without signing a register or making any other indication in the file drawer (or elsewhere) that the files had been removed.

(*Id.* at 13–14 (citations omitted).)

## DISCUSSION

### A. *The Status of the Merchandise & The Mistake*

■ Ford contends its failure to pay duties before entering the engines and transmissions into the FTSZ and its "inadvertent" election of "NPF" status instead of "PD" status on the Customs 214 Forms for the merchandise at issue constitutes a clerical error, mistake of fact or other inadvertence with respect to the eleven entries at issue and should be corrected under 19 U.S.C. § 1520(c)(1) (1982). Section 1520(c) provides in relevant part:

#### (c) **Reliquidation of entry**

Notwithstanding a valid protest was not filed, the appropriate customs officer may, in accordance with regulations prescribed by the Secretary, reliquidate an entry to correct—

> (1) a *clerical error,* mistake of fact, or other inadvertence *not amounting to an error in the construction of a law,* adverse to the importer and manifest from the record or established by documentary evidence, in any entry, liquidation, or other customs transaction, when the error, mistake, or inadvertence is brought to the attention of the appropriate customs officer within one year after the date of liquidation or exaction. . . .

19 U.S.C. § 1520(c) (1982) (emphasis added). This Court has held 19 U.S.C. § 1520(c)(1) is not a remedy for all conceivable mistakes or inadvertences, but rather offers " 'limited relief in the situations defined therein.' " *PPG*

*Industries, Inc. v. United States,* 7 CIT 118, 123, 1984 WL 3749, *4 (1984) (citations omitted). *See also Boast, Inc. v. United States,* 17 CIT 114, 116, 1993 WL 45902 (1993) (citations omitted) ("It is well-established . . . [Section 1520(c)(1) ] . . . 'affords 'limited relief' where an unnoticed or unintentional error has been committed.' "). This Court has further held that in asserting the subject merchandise has been wrongly classified or assessed incorrect duties due to clerical error, it is incumbent on the plaintiff to show by sufficient evidence the nature of the clerical error. The duty is on the plaintiff to inform the appropriate Customs official of the mistake "with 'sufficient particularity to allow remedial action.' " *PPG Industries, Inc. v. United States,* 4 CIT 143, 148 (1982) (*quoting Hambro Automotive Corp. v. United States,* 81 Cust. Ct. 29, 31, 458 F.Supp. 1220, 1222 (1978), *aff'd,* 66 C.C.P.A. 113, 603 F.2d 850 (1979)).

■ Section 1520(c)(1) affords relief only in cases where a mistake of fact, clerical error or other inadvertance has occurred. "A 'mistake of fact exists where a person understands the facts to be other than what they are' " and takes some action based on that erroneous belief, " 'whereas a mistake of law exists where a person knows the facts as they really are but has a mistaken belief as to the legal consequences of the facts,' " and acts on that mistaken belief. *Hambro Automotive Corp,* 66 C.C.P.A. at 118, 603 F.2d at 853 (*citing* 58 C.J.S. *Mistake* 832–33 (1948)). *See also Boast, Inc.,* 17 CIT at 116, 1993 WL at 45902 at *1 (defining mistake of fact as " 'a mistake which takes place when some fact which indeed exists is unknown, or a fact which is thought to exist, in reality does not exist' ") (*quoting C.J. Tower & Sons of Buffalo, Inc. v. United States,* 68 Cust. Ct. 17, 22, 336 F.Supp. 1395, 1399 (1972), *aff'd,* 61 C.C.P.A. 90, 499 F.2d 1277 (1974)). In *PPG Industries, Inc. v. United States,* this Court explained an error in the construction of law would occur, for example when

> the exact physical properties of certain merchandise and all other pertinent facts for classification of that merchandise are known. In applying the law the merchandise is classified as an entirety but it

should have been classified as separate articles. Or the claim is made that an appraiser acts on incomplete information but the appraiser concludes he would have acted in the same way even if the missing information had been before him. If the appraiser errs in such a case, he commits error of law.

*PPG Industries, Inc.*, 7 CIT at 123–24, 1984 WL 3749 at *5 (*quoting* 94 Treas. Dec. 244, 246, T.D. 54848 (1959)).

Decisions of this Court have established a distinction between cases involving a mistake of fact and those involving a mistake of law based on whether the importer had actual knowledge of the nature and use of the goods at issue. In cases where the Court has concluded an importer did not know the facts as they really were, and therefore lacked true knowledge of the ultimate character of the merchandise, the Court has found a mistake of fact existed. *See, e.g., Universal Cooperatives, Inc. v. United States*, 13 CIT 516, 518, 715 F.Supp. 1113, 1114 (1989) (distinguishing "decisional" mistakes where party makes wrong choice between two known alternate set of facts, and "ignorant" mistakes, where party is unaware of the existence of the correct set of facts; holding only "ignorant" mistakes can be challenged pursuant to 19 U.S.C. § 1520(c)(1)); *PPG Industries, Inc.*, 7 CIT at 125, 1984 WL 3749 at *6 (holding mistake of law exists where importer is fully aware of the merchandise's nature but believes the legal consequences of it to be other than what they were).

■ In addition to allowing correction for mistakes of fact, 19 U.S.C. § 1520(c)(1) also encompasses "clerical error[s]". A clerical error has been explained to cover a situation where a person intends to do one thing but does something else, for example, writing "par. 231" instead of "par. 131". *See* 94 Treas. Dec. 244, T.D. 54848 (1959). Clerical errors also include mistakes in arithmetic. *See, e.g., PPG Industries, Inc.*, 7 CIT at 124 (citations omitted) (defining clerical error as mistake by a "clerk or other subordinate, upon whom devolves no duty to exercise judgment, in writing or copying the figures or his exercising his intention").

■ Finally, 19 U.S.C. § 1520(c)(1) affords relief for "other inadvertence." Case law has defined an inadvertence as an inattention, oversight, negligence, or lack of care. *See Aviall of Texas, Inc.*, 18 CIT at 734, 861 F.Supp. at 106–07 (citing *C.J. Tower & Sons*, 68 Cust. Ct. at 22, 336 F.Supp. at 1399) (defining inadvertence as " 'an oversight or involuntary accident, or the result of inattention or carelessness' "); *B.S. Livingston & Co., Inc. v. United States*, 13 CIT 889, 892 (1989) (same). Clerical errors, mistakes of fact or other inadvertences are not necessarily mutually exclusive terms, and in some cases a mistake of fact might also be a clerical error or other inadvertence. *See* 94 Treas. Dec. 244, T.D. 54848 (1959).

Ford argues its employee, Mr. Tullock, acted in a clerical capacity only and "exercised no 'original thought or judgment' in determining which box to check or in failing to pay the duties." (Pl.'s Br. at 28.) As a result, Ford argues his mistake is a clerical error within the scope of 19 U.S.C. § 1520(c)(1) and is not an error in the construction of a law. Ford argues "the essence of clerical error is intention" and claims because Mr. Tullock did not intend to claim "NPF" status for the entries, he "committed clerical errors and other inadvertences and was mistaken as to the relevant facts in this case." (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Mem. in Opp'n") at 4.)

Additionally, Ford argues the actions by its employee constitute mistakes of fact, correctable under 19 U.S.C. § 1520(c)(1) (1982). Ford cites C.S.D. 89–29, 23 Cust. Bull. 583 (1988) for the proposition that where evidence shows the importer had an intent which is explicit and ascertainable from the record, and action is taken contrary to that intent, a mistake of fact has occurred. Ford concludes "[o]bviously, Mr. Tullock's failure to pay the duties on the subject engines and transmissions for trucks and enter them into the FTSZ as 'PD' and his checking the 'NPF' box on the Customs 214 Forms is contrary to FORD's instructions and well-documented intentions and clearly constitutes a 'mistake of fact'." (Pl.'s Br. at 32–33.)

Finally, Ford contends the errors of its employee could be defined as an "inadver-

tence", which is correctable under 19 U.S.C. § 1520(c)(1) (1982) because "no one expends the money, time, and effort required to establish an FTSZ so that they can pay additional Customs duties ... in amounts in excess of 800% of the duties payable without using an FTSZ." (*Id.* at 6.) Ford argues its employee's actions fall within the "broad meaning of 'inadvertence,' because [they] were clearly contrary to the instructions from FORD." (*Id.* at 33.)

In making its argument for relief under 19 U.S.C. § 1520(c)(1) (1982), Ford also relies on the decision of this Court in *Executone Information Systems v. United States*, 896 F.Supp. 1235 (CIT 1995), *aff'd*, 96 F.3d 1383 (Fed.Cir.1996). In *Executone*, the Federal Circuit held the mistaken belief that certain documents had been filed, when, in fact, they had not been filed, was a mistake of fact correctable under 19 U.S.C. § 1520(c)(1). *See* 96 F.3d at 1388. Although the Federal Circuit ultimately held in favor of the Government due to the importer's failure to provide enough evidence to establish the existence of a mistake of fact, clerical error, or other inadvertence, *see* 96 F.3d at 1390, Ford argues such evidence has been clearly established and substantiated in this case. (Pl.'s Post–Suspension Mem. at 3.)[4]

Defendant argues the record clearly demonstrates Ford failed to meet the requirements for claiming "PD" status for the engines and transmissions at issue in this case because "Ford (a) failed to pay duty upon these items before they entered the FTZ and (b) Ford did not have in place the requisite inventory reporting and control system for tracking PD merchandise through its subzone." (Def.'s Br. at 18.)[5] Defendant adds "[b]eyond this, the entries themselves demonstrate beyond any doubt that the Ford employee who prepared the entries did not intend to claim PD status, but, rather, deliberately claimed NPF status." (*Id.*) Defendant concludes, therefore, "[t]here is simply no way that Ford's failure to [pay duties on the items before they entered the FTSZ] can be characterized in any other way than as a mistake of law." (*Id.*)

Defendant maintains Ford has not met its burden of identifying a fact which was unknown to Ford or a mistake of fact that led Ford to ignore applicable Customs requirements. Instead, defendant argues, "Ford's error consists of Mr. Tullock's ignorance or misconstruction of the prerequisites for claiming PD status. This is not the kind of error that is remediable under 19 U.S.C. § 1520(c)(1)." (*Id.* at 19.)

**4.** Defendant observes the *Executone* Court noted that, although the plaintiff had made conclusory allegations that a mistake of fact or clerical error had occurred, there was no indication in the record that the failure to file the proper forms was due to such a mistake as opposed to intentional or negligent inaction. Defendant adds,

[s]imilarly in the present case, Ford has failed to demonstrate that the claiming of NPF status for the subject merchandise, the failure to pay duties on the merchandise and the lack of an adequate inventory system were actually the result of a mistake rather than the intentional or negligent actions of a person or people who were under no factual misperception.... Furthermore, Mr. Tullock continued making the "clerical error" alleged in this action even after Lars Anderson explained to him "that it was wrong for Ford to enter NPF parts contained [sic] incomplete trucks as parts at the part rate. Like the plaintiff in *Executone*, Ford was negligent in failing to ensure that its employee carried out its instructions. Ford's negligence is not remediable under section 1520(c). Thus, although we agree with Ford that *Executone* is persuasive in this matter, it should persuade this Court that, like the plain-

tiff in *Executone*, Ford has merely alleged, but has not sufficiently demonstrated, the existence of a "clerical error, mistake of fact, or other inadvertence" within the meaning intended by 19 U.S.C. § 1520(c).
(Def.'s Reply to Ford's Post–Suspension Br. at 5–6 (footnote omitted).)

**5.** In its Memorandum in Opposition to Defendant's Motion for Summary Judgment, Ford objects to defendant's references to deficiencies in Ford's Inventory Control and Record Keeping systems, arguing this subject is not relevant to this decision, which deals solely with the circumstances regarding the election of zone status and to the validity of the liquidations of the subject entries in 1989. This Court finds it need not reach this issue and its decision is not based on whether Ford's Inventory Control and Record Keeping systems were deficient. Therefore, this Court does not address Ford's argument that "the inclusion of this Record Keeping and Inventory Control 'issue,' which is now made in Defendant's Summary Judgment Motion is the proverbial 'red herring,' designed to distract the Court from focusing on the relevant issues involved in this case." (Pl.'s Mem. in Opp'n at 9.)

Defendant additionally argues Ford cannot point to any clerical error or inadvertence to explain the mistake in the entries because "the entries themselves leave no question that Ford *deliberately* claimed NPF treatment for the merchandise at issue." (*Id.* at 20.) Defendant explains each of the entries described the subject merchandise as "transmissions for trucks" or "engines· for trucks" subject to duty at the parts rate applicable to unmanipulated engines and transmissions. On each of the entries, defendant explains, Ford also claimed "PD" treatment for *other* merchandise by indicating that such merchandise was non-dutiable by writing "PD" or a null symbol where the entries would otherwise indicate the amount of the duty. Defendant concludes the only possible explanation with respect to Ford's entirely different treatment of the merchandise at issue (*i.e.,* describing the merchandise as "parts" and entering it at the duty rate applicable to NPF parts) "is that, notwithstanding Ford's claims to the contrary, Mr. Tullock had no intention of claiming PD treatment for this merchandise." (*Id.*) Defendant maintains

[f]ar from blindly claiming PD status for all entered engines and transmissions, Mr. Tullock was required to exercise his judgment in order to determine which proportion of parts should enter the FTZ in PD status—and which proportion should enter the FTZ in NPF status. This judgment depended upon sophisticated calculations to determine the exact quantity of engines and transmissions needed to assemble cars and trucks so that there would always be the correct number of parts on hand in the correct status.

. . . .

That these "inadvertences" were, in fact, intentional is sharply illustrated by the fact that even after Mr. Anderson had made it clear to Mr. Tullock that it was improper to enter NPF engines and transmissions at the parts rate, Mr. Tullock continued the practice. Unfortunately, this Court will never hear direct testimony regarding Ford's intent in making the misrepresentations at issue because Ford's Louisville personnel responsible for the operation of the FTZ have experiences a collective loss of memory.

(Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Mem. in Opp'n") at 5–6 (citations omitted).)

Defendant also asserts "Customs made it clear to Ford that Ford alone assumed the responsibility of ensuring its compliance with applicable United States Customs requirements and regulations." (*Id.* at 7.) Defendant contends Ford cannot gain relief under 19 U.S.C. § 1520(c)(1) simply by arguing its employee failed to follow instructions because "[a]n importer must bear the responsibility for the actions of its employees if Customs laws are to have any meaning." (*Id.* at 12.)

After considering the arguments of the parties, this Court finds Ford did not commit a clerical error, mistake of fact or other inadvertence that would allow it relief under 19 U.S.C. § 1520(c)(1) (1982). This Court notes it is clear that Ford's engines and transmissions were not eligible for "PD" status unless Ford paid duties on the merchandise before the merchandise entered the FTSZ and specifically elected "PD" status for the entries. (*See* Pl.'s Br. at 8; *supra* n. 2.) This Court also notes while Ford may have intended to elect "PD" status and to pay the duties as the engines and transmissions were entered into the FTSZ, as Ford itself admits, "for some inexplicable reason," Ford failed to do so. (Pl.'s Br. at 27.) This Court does not find Ford was mistaken as to the ultimate nature of the merchandise, and so cannot find Ford made a mistake of fact in this case on that basis. *See Zaki Corp. v. United States,* 960 F.Supp. 350, 362–63 (CIT 1997) (holding mistake of fact exists where broker unintentionally and non-negligently was unaware of the physical nature of the imported merchandise and Customs relied on agent to enter good properly); *Taban Co. v. United States,* 960 F.Supp. 326, 338–39 (CIT 1997) (same); *NEC Electronics U.S.A., Inc. v. United States,* 13 CIT 214, 217, 709 F.Supp. 1171, 1174 (1989) (no remedy for mistake of fact where importer had "actual knowledge of the nature of the goods"); *Concentric Pumps, Ltd. v. United States,* 10 CIT 505, 509–10, 643 F.Supp. 623, 625–26 (1986) (lack of knowledge that duty-free treatment was available under Tariff Schedule is mis-

take of law, not mistake of fact); *PPG Industries, Inc.*, 7 CIT at 126 (no relief where importer "fully aware" of nature of merchandise); *Godchaux–Henderson Sugar Co., Inc. v. United States*, 85 Cust. Ct. 68, 496 F.Supp. 1326, 1331 (1980) (failure to file consumption entry within time limit required for duty-free treatment is mistake of law, not mistake of fact). In fact, Ford claims its employee "has no explanation as to exactly how the wrong foreign trade zone designation was placed on the 214 Forms." (Pl.'s Reply to Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J. ("Pl.'s Reply") at 26.)

Further, this Court does not agree Ford made a unintentional clerical error or other inadvertence which led to its choosing "NPF" treatment for the entries at issue. In *B.S. Livingston & Co., Inc.*, 13 CIT at 892 (quoting *C.J. Tower & Sons of Buffalo, Inc.*, 68 Cust. Ct. at 22, 336 F.Supp. at 1399), this Court defined "inadvertence" as " 'an oversight or involuntary accident, or the result of inattention or carelessness.' " This Court has also held one of the purposes of 19 U.S.C. § 1520(c)(1) is to eliminate " 'certain unnecessary annoyances and inequities which plague both government and private parties engaged in the import-export business.' " *Aviall of Texas, Inc.*, 18 CIT at 734, 861 F.Supp. at 106 (citations omitted). The actions in this case cannot be described as unnecessary annoyances and inequities. Rather, Ford described the entries at issue as "parts" and entered the merchandise at the duty rate applicable to "NPF" parts. This Court believes the evidence indicates Ford's employee was required to exercise his judgment and make certain calculations in order to determine which parts should enter the FTSZ in "PD" status and which proportion of parts should enter in "NPF" status. As a result, this Court finds relief under 19 U.S.C. § 1520(c)(1) (1982), which offers "limited relief in the situations defined therein", *Godchaux–Henderson Sugar Co., Inc.*, 85 Cust. Ct. at 74, 496 F.Supp. at 1331 (*quoting Phillips Petroleum Co. v. United States*, 54 C.C.P.A. 7, C.A.D. 893 (1966)), is not warranted in this case because Ford's errors do

not fall within the situations the statute specifically enumerates.

This Court recognizes it was not Ford's intention "to be required to pay 25% *ad valorem* duties" which totaled an additional $5,000,000 on the eleven entries. This Court gives little weight to Ford's argument Customs contributed to the assessment of the additional $5,000,000 in duties by not rejecting the entries outright when they were initially filed. While this Court finds the mistakes in the entries could have resulted in their being rejected outright by Customs, this Court also finds it was Ford's duty, and not the duty of Customs, to accurately file the entries, pay the duties before the merchandise entered the FTSZ and claim "PD" status. Ford is a sophisticated corporation that reasonably could be expected to prepare entry documents with accuracy.

Contrary to Ford's argument, the case *Aviall of Texas, Inc.*, is not applicable here and Customs did not "snare[ ] [Ford] in a classic 'gotcha'." (Pl.'s Br. at 21 (*quoting Aviall of Texas, Inc.*, 18 CIT at 735, 861 F.Supp. at 107.)) In *Aviall of Texas Inc.*, documentation certifying the company to import civil aircraft engines and engine parts free of duty had been accurately filed with the Customs Service "on a regular basis for years" and was corrected as soon as the error was brought to the company's attention. *See* 861 F.Supp. at 107.[6] In this case, however, Ford failed to claim "PD" status for the entries at issue, even after being notified of the wrong foreign trade zone designation when Ford's Dearborn Headquarters officials came to Louisville to assist the employee in charge and identified the problem. (*See* Pl.'s Reply at 26.) The testimony of Lars Anderson demonstrates Mr. Tullock's understanding of the status designation problem.

Q. Did you instruct Mr. Tullock that it was wrong for Ford to enter NPF parts contained in completed trucks as parts at the part rate?

A. Right. He knew that because——— well, that was a heavy piece of conversation between ourselves in all the zones.

6. As the Court of Appeals for the Federal Circuit noted, "Aviall missed a deadline which silently passed without notice. Aviall acted promptly to

correct the mistake which occurred through inadvertence." *Aviall of Texas, Inc. v. United States,* 70 F.3d 1248, 1251 (Fed.Cir.1995).

. . . .

A. Well, he understood it when we started and whether something slipped thereafter, I can't say.

(Def.'s Reply at 16–17 (*quoting* Anderson Dep. 125–27).) The testimony of Anderson continued to note

Q. Did you discuss with Mr. Tullock about what the term "PD" meant?

A. Yes. He was aware of all the general Customs phrases and terms that were needed to operate and understand the mechanism of operating a zone.

(*Id.* at 21 (*quoting* Anderson Dep. at 129–33).)

Although Ford argues immediate detection by Customs of the errors in the entries "would have made it possible for FORD to avoid the $5,000,000 assessment by exporting or disassembling the vehicles which were already assembled and duty-paying the foreign components which were not yet assembled", (Pl.'s Br. at 23), this Court finds Ford is a sophisticated corporation which is accountable for its errors and cannot blame the Customs Service for its failure to reject the entries. Additionally, the Court notes Customs was specifically concerned that Ford had improperly classified cars as trucks, (*see* Def.'s Resp. to Pl.'s Fourth Set of Interrogs. & Req. for Admis. at 2 (*reprinted in* Pl.'s App. Ex. 21)), and there was an ongoing investigation regarding an alleged violation of 19 U.S.C. § 1592 (1988) and potential misrepresentations of information by Ford regarding the classification or appraisement of entered merchandise. This Court previously noted "[t]he government has no cognizable interest in retaining duties which were improperly collected as a result of clerical error, mistake of fact, or inadvertence." *Aviall of Texas, Inc.*, 18 CIT at 735, 861 F.Supp. at 107. This Court finds, however, the duties in this case were properly collected. Ford has failed to prove that Mr. Tullock, whose illness prevents him from clearly remembering his own actions regarding the events at issue in this case, made a mistake of fact, clerical error or other inadvertence. As a result, this Court holds 19 U.S.C. § 1520(c)(1) offers no relief to Ford in this case.

B. *Receipt of the Extension Notices*

The statute provides that merchandise "not liquidated within one year" of its entry into the United States is liquidated by operation of law on the first anniversary of the date of entry "at the rate of duty, value, quantity, and amount of duties asserted at the time of entry by the importer" or its agent. 19 U.S.C. § 1504(a) (1982). The statute, however, includes several exceptions which permit Customs to extend liquidation beyond the first anniversary of the goods entering the United States by notifying the importer of the extension. One exception allows an extension if "information needed for the proper appraisement or classification of the merchandise is not available to the appropriate customs officer." 19 U.S.C. § 1504(b)(1) (1982). The statute also requires that "[i]f the liquidation of any entry is suspended . . . notice of such suspension [will] be provided to the importer [of record] concerned and to any authorized agent and surety of such importer [of record]." 19 U.S.C. § 1504(c) (1982). *See also* 19 C.F.R. § 159.12(b)-(d) (1985) (if liquidation is extended or suspended, the importer must be notified promptly that the time for liquidation has been extended and of the reasons for the extension).

Ford argues the entries at issue should be deemed liquidated "as entered" by operation of law one year after they were filed because neither Ford nor its surety received any of the sixty-six notices of extension of liquidation applicable to the entries. Ford contends defendant relies solely on computer printouts which indicate the notices were prepared and argues "Customs has chosen to dispose of hard copies which would be otherwise available as evidence that [n]otices were actually prepared." (Pl.'s Br. at 35.) Additionally, Ford maintains Customs

has been unable to produce a single witness employed by either the Government or by its contractors who can personally testify that the 66 Extension Notices allegedly mailed to FORD and its surety were actually printed, reviewed and/or placed in the U.S. Mail. Finally, the Defendant has been unable to produce an actual copy of any of the 66 Extension Notices, which it

claims were generated and mailed to FORD and to FORD's surety, and the Defendant cannot even produce the computer tapes which allegedly produced the Extension Notices in the subject entries. (*Id.*) Plaintiff maintains Ford and its surety conducted extensive searches of their records kept in the regular course of business but located no evidence that the notices had ever been received. Ford also argues "[v]arious courts have held that the failure to receive a notice through the mail raises a presumption that it was not mailed" and asserts this presumption shifts the burden back to the Government to prove the fact of mailing. (Pl.'s Br. at 38–39 (*citing F.W. Myers & Co., Inc. v. United States,* 6 CIT 215, 217, 574 F.Supp. 1064, 1066 (1983) (holding affidavit stating "[w]e searched our files and were unable to locate any notice of Customs Service action on this protest, and we believe that no notification was sent to us" was sufficient to raise the presumption of non-receipt of notice)).)

Ford concludes the evidence in this case "is insufficient to rebut the affidavits of FORD's personnel and of FORD's surety and the testimonial evidence given in the depositions which establishes that none of the alleged 33 Extension Notices [was][sic] sent to each." (Pl.'s Br. at 41–42.) Ford argues because Customs failed to give notice of the extensions, its efforts to extend the time for liquidation of the entries were unsuccessful. As a result, plaintiff argues, the eleven entries at issue should be deemed liquidated by operation of law, as entered, one year from their respective dates of entry.

In response, defendant argues "[t]here is a presumption in favor of the Government that Ford received proper notice." (Def.'s Br. at 22 (*citing International Cargo & Sur. Ins. Co. v. United States,* 15 CIT 541, 544, 779 F.Supp. 174, 177 (1991); *Star Sales & Distributing Corp. v. United States,* 10 CIT 709, 710, 663 F.Supp. 1127, 1129 (1986)).) Defendant argues Ford cannot rebut this presumption "because neither Ford nor its surety maintain sufficient records to establish non-receipt of the notices of extension at issue." (Def.'s Br. at 22.) Defendant explains because Ford's surety conceded it did not generally retain notices of extension that it received from Customs[7] and could not produce a single notice of extension relating to Ford, "there is simply no logical basis to infer nonreceipt of such notices by their absence from the surety's records" and, therefore, "there is no evidence to rebut the presumption that the surety received such notices." (*Id.* at 22–23.)

Defendant also asserts Ford's records are insufficient to establish an inference of non-receipt. Defendant argues because Ford could not produce any records of notices predating August 1991, "the records that Ford allegedly searched in determining that it had not received the notices of extension at issue in this case have been destroyed" and "the destruction of relevant evidence may warrant an inference that the evidence would have been unfavorable." (*Id.* at 23.) Defendant adds even if Ford had not destroyed its records, "the evidence developed during depositions establishes that Ford's recordkeeping is so inadequate that no inference of non-receipt can reasonably arise from the absence of the notices in the records." (*Id.* at 24.) Defendant points to statements by the former supervisor or Ford's Customs Division, who stated when she received a notice of extension, she would simply file it without making copies or informing anyone of its receipt. Defendant concludes Ford's recordkeeping is so poor and "the contours of its document destruction policy are so ambiguous" that Ford cannot even explain why other pre–1991 notices of extension not at issue

---

7. Defendant notes that despite Customs' mailing over 23,277 notices to Ford's surety since 1986, the surety was unable to produce a single one of those notices. (Def.'s Mem. in Opp'n at 14.) Defendant also cites the testimony of an employee of the surety:

Q: Well, do you have any reason to believe that Notices of Extension are retained by the field offices as a matter of company policy? Do you know one way or the other?

A: They—they may or not be retained, again depending on the circumstances.

(Def.'s Reply to Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. ("Def.'s Reply") at 25 (*citing* Jewitt Dep. 29–32).) The surety's employee continued to admit it was possible that the reason no notices were found when the files in the field office were searched is because "the notices were received ... [but] just not placed in the file." (*Id.* at 26.)

in this case are absent. (*Id.* at 25.) Defendant argues that because the notices of extension received by Ford were maintained "loose" in manila folders in two file drawers in an unlocked file cabinet situated in a common hallway, the files could have been removed or disposed of without notice. Defendant concludes,

> [i]n sum, the evidence contained in the record does not support a reasonable inference that Ford failed to receive the notices at issue. To the contrary, it would be equally reasonable to infer that the notices were removed by one of the many people who have access to Ford's unlocked files, destroyed, lost in Ford's 1989 move to its new headquarters, or not properly filed in the first place.

> Finally, it is not surprising that [Ford's managers] can[not] recall reviewing the notices of extension. This is so because the notices of extension were opened and filed by a secretary, who would not have informed [them] that the notices has been received.

(Def.'s Reply to Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. ("Def.'s Reply") at 35–36 (citations omitted).)

■ Examining the evidence on the record, the Court finds that although defendant possesses no direct proof the extension notices were mailed, this lack of direct evidence does not automatically defeat the Government's ability to establish the extensions were prepared and mailed. In *A.N. Deringer, Inc. v. United States*, Slip Op. 96–131, 1996 WL 467736 (CIT Aug. 13, 1996), the Court relied on 19 U.S.C. § 1504 (1988) and 19 C.F.R. § 159.12 (1987) to uphold the Government's assertion that the requisite notices of extension and suspension of liquidations were given to the importer, who was unable to establish non-receipt thereof. In *Deringer*, the Court addressed two presumptions. First, the Court recognized a presumption of regularity attaches to the acts of government officials, a presumption that, unless rebutted by Ford, would establish that the extension notices were properly prepared and mailed by Customs. *See Deringer*, Slip. Op. 96–131 at 17 (*citing International Cargo & Surety Insur. Co.*, 15 CIT at 544, 779 F.Supp. at 177 (1991) (finding presumption of regularity gives rise to a presumption that appropriate notice is provided in accordance with statutory and regulatory requirements).) The Court in *Deringer* also recognized the presumption that proof of mailing raises a presumption of delivery, which is rebutted by proof of non-receipt. *Id.* at 18 (*citing Intra–Mar Shipping Corp. v. United States*, 66 Cust. Ct. 3, 5–6, C.D. 4160 (1971)). *See also Rosenthal v. Walker*, 111 U.S. 185, 193, 4 S.Ct. 382, 386, 28 L.Ed. 395 (1884) (letter properly directed that is placed in the mail or delivered to postal carrier is presumed to have reached its destination and to have been received by person to whom it was addressed). In *Deringer*, the Court reviewed extensive evidence of the computer system in place for the notice, preparation and mailing of notices, as well as testimony from the same Customs officials deposed in this case, and determined the presumption of regularity that attaches to official acts was appropriate, despite the absence of direct proof the extension notices were prepared and mailed. *See Deringer*, Slip. Op. 96–131 at 13–14. This resulted in a presumption that notice had been given in accordance with statutory and regulatory requirements.

The Court notes Ford's argument the decision in *Deringer* should not be followed, because, unlike in *Deringer*, in this case, "the Government has neither succeeded in establishing that all the notices were printed nor that they were all placed in the mail, which is specifically recognized in the *Deringer* case as part of the Government's burden." (Pl.'s Post–Suspension Mem. at 6–7.) The Court also notes defendant's counter-argument that, "as the *Deringer* court found, lack of direct evidence does not automatically defeat the Government's ability to establish the facts that give rise to relevant presumptions." (*Id.* at 8.) This Court finds the facts and reasoning in *Deringer* are applicable here. The Court observes in this case, Customs points out an import specialist authorized the issuance of the extensions and a computer printout furnished to Ford identified the dates the notices were printed. The Chief of the Entry Control Processing Branch, a branch within the Commercial Systems Division of Customs, explained that

once data regarding an extension of liquidation is entered into Customs' Automated Commercial System ("ACS"), the extension notice is automatically scheduled to be printed on the following weekend, as part of Customs' "end-of-week" processing, and notices of extension are formatted and printed by computer onto Customs Form 4333A. (*See* Declaration of Arthur Versich at 1–2 (*reprinted in* Def.'s App. at 172–77).)[8] Based on his knowledge of the notice system and his experience as a former import specialist, Mr. Versich concluded "that 66 notices were issued on an appropriate basis each time, and the notices were properly addressed and timely printed and mailed." (*Id.* at 4.) Additionally, Roger Odom, the Supervisor for Customs' Computer Operations and Production Management Section, who was responsible for computer operations at Customs' Data Center, explained that after the notices are printed and addressed by computer, they are removed by an operator and placed in plastic trays provided by the Postal Service, and are picked up by the Postal Service within twenty-four hours of printing. (*See* Declaration of Roger Odom at 4 (*reprinted in* Def.'s App. at 178–82).) An employee from Customs' Office of Automated Commercial Systems additionally testified that records demonstrate for each entry, a notice to the importer and a notice to the surety for a first extension was printed on or shortly after October 25, 1986, for a second extension on or shortly after November 28, 1987, and for a third extension, on or shortly after October 22, 1988. (*See* App. to Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J. at 175.)

As a result of the above, this Court finds Ford has not identified any deficiency in Customs' automated system for mailing notices to establish non-receipt of the sixty-six notices. Rather, the Court finds the computer systems in place at Customs for the preparation and mailing of extension notices are sufficient to give rise to the presumption that Customs properly prepared and mailed the notices of extension of liquidation. These notices are presumed to have been received by the plaintiff, who has the burden of prov-

ing non-receipt. As the *Deringer* Court noted, "[t]o require the government to prove not only mailing, but actual receipt of Form 4333–A by the importer, would erect a virtually unassailable hurdle. Rarely, if ever, would the government possess or elicit proof of receipt from an importer claiming nonreceipt." *Deringer,* Slip Op. 96–131 at 32.

■ This Court also finds Ford has not adequately satisfied the burden of showing the sixty-six notices of extension were not received by either Ford or its surety. As in *Deringer,* sufficient evidence to establish the notices were prepared and mailed based on the presumption of regularity was presented in this case and the burden of proving non-receipt shifted to the plaintiff. *See Deringer,* Slip Op. 96–131 at 32. This Court is not persuaded that Ford's internal record retention and transmittal system could account adequately for all incoming mail so as to preclude the misplacement of extension and suspension notices. *See e.g., International Cargo & Surety Insur. Co.,* 15 CIT at 544, 779 F.Supp. at 177; *Intra–Mar Shipping Corp.,* 66 Cust. Ct. at 5–6, C.D. 4160 (1971); *Rosenthal,* 111 U.S. at 193, 4 S.Ct. at 386, 28 L.Ed. 395. The Court notes defendant's argument that

> [t]he computer system utilized by Customs to send the notices to Ford is the same one that was discussed in *Deringer.* ... The *Deringer* case establishes that the systems in place at the Customs Service are sufficient to give rise to the presumptions that the notices of extension were generated and mailed. ... Ford's internal record retention system falls woefully short of what is required to rebut the presumption that the extension notices were, in fact, mailed and received.

(Def.'s Reply to Pl.'s Post–Suspension Mem. at 9.) This Court finds Ford has been unable, as a matter of law, to rebut the presumption that it received the notices of extension. This Court notes the deposition testimony of a Ford employee:

---

8. *See Deringer,* Slip Op. 96–131 at 22–30 for a more detailed explanation of Customs' Automated Commercial System.

Q: Okay. So [a secretary] opens this letter, sees it is a notice, and she sticks it in a supervisor's slot. Which supervisor would that be?

A: No, she would not have done that. She would have filed it.

Q: She would file it? She would open— she would open the notice and she would then file the notice?

A: Yes.

Q: Would she tell anyone that you had received it?

A: The file was there for reference if someone needed to use it.

Q: So you are telling me, your testimony is, [the secretary] receives a notice, opens it, and seeing that it's a Notice of Extension of Liquidation, she doesn't inform anyone, she just goes and files it?

A: That's correct.

Q: Would she make copies of it?

A: No.

(Def.'s Reply at 36 (quoting Cohen [9] Dep. at 51).) The Court notes Ford was asked at oral argument to show that it kept accurate records with regard to the extensions sent to it from time to time. *See* Oral Arg. Tr. at 57–58. The Court finds Ford failed to offer sufficient evidence to rebut the presumption of regularity and to prove the non-receipt of the extensions in this case by showing with sufficient evidence that its record-keeping system accurately kept note of and established the non-receipt of notices of extensions.

Finally, the Court notes Ford's argument that Customs should protect itself in cases involving potentially large losses of revenue, such as this one, by sending notices of extension in a method which is calculated to insure receipt with proof of receipt. The Court finds, however, it is Customs' responsibility and not this Court's to mandate such a change in policy. The *Deringer* Court noted that under 19 U.S.C. § 1504, Customs is afforded the discretion to choose the "form and manner" of providing notice to the importer of an extension of liquidation. *Deringer*, Slip Op. 96–131 at 31. The Court also noted "[a]s demonstrated by the regulations,

Customs has chosen the ordinary mailing of a Form 4333–A to provide such notice to the importer. There is nothing to indicate that this means of providing notice fails to comply with Customs' statutory mandate." *Id.* This Court finds no reason to depart from this policy. The Court further notes the statement in *Deringer* that "[a] claim of nonreceipt in this context must be scrutinized carefully by the court, given the incentive that a plaintiff may have to claim that no notice was received." *Id.* at 15. The Court finds the evidence Ford presented was insufficient to establish non-receipt of the notices. As a result, this Court finds the presumption the notices were mailed and delivered to Ford has not been overcome.

*C. The Legality of the Extensions of Liquidation*

■ As noted above, pursuant to 19 U.S.C. § 1504(b)(1) (1982), Customs is authorized to "extend the period in which to liquidate an entry ... if (1) *information needed for the proper appraisement or classification* of the merchandise *is not available* to the appropriate customs officer." 19 U.S.C. § 1504(b) (1982) (emphasis added). The regulation implementing the statute further provides that

If the district director extends the time for liquidation, as provided in paragraph (a)(1) of this section, he promptly shall notify the importer or the consignee and his agent and surety on Customs Form 4333–A, appropriately modified, that the time has been extended and the reasons for doing so.

19 C.F.R. § 159.12(b) (1985). Because this Court has found Ford failed to rebut the presumption that notice of the extensions of liquidation was given, the last issue before the Court is whether the extensions were permissible under the statute.

Ford argues Customs lacked a legitimate basis for issuing the three extensions of liquidation and abused its discretion in issuing the extensions because "the *only* stated reason for the initial referral to the Office of Enforcement was the significant amount of the revenue involved. There was no mention

---

9. Donald Cohen is the Manager of U.S. Customs Compliance and Operations at Ford.

of any classification or valuation facts to be developed." (Pl.'s Reply at 43–44.) Ford adds even assuming a valid reason for extending the liquidations existed initially, the length of the extensions clearly was unreasonable and an abuse of discretion by Customs. Ford argues it is clear that on or before June 16, 1986, the appropriate customs officer had all the information necessary to classify, appraise and liquidate the entries at issue in this case, making it unnecessary for Customs to extend the liquidation of the entries until December 1, 1989.

Ford argues *St. Paul Fire & Marine Insur. Co. v. United States,* 6 F.3d 763 (Fed. Cir.1993) is dispositive of this issue. In *St. Paul,* the Court held Customs cannot extend liquidation where the importer eliminates "all reasonable bases for making th[e] decision" to extend the liquidation period. *St. Paul Fire & Marine Insur. Co.,* 6 F.3d at 768. Ford argues in this case it is undisputed that "Customs made no request to Ford to produce any further information bearing on the classification or the valuation of the subject merchandise, and there is no evidence that Customs pursued these subjects thereafter." (Pl.'s Mem. of March 7, 1995 Resp. to Req. of Ct. Made at Oral Arg. at 7.)

Defendant, however, argues "Ford and its surety were each given the proper amount of notices of *extension* of liquidation to permit the liquidations of the 11 subject entries to be extended to their dates of liquidation." (Def.'s First Am. Answer at 2 (*reprinted in* Pl.'s App. Ex. 12).) Defendant explains the extensions were issued because there was an *ongoing* investigation regarding an alleged violation of 19 U.S.C. § 1592 (1988). (*See* Def.'s Resp. to Pl.'s Second Set of Interrog. & Req. for Produc. at 19 (*reprinted in* Pl.'s App. Ex. 20).) Defendant maintains in order for Ford to prevail on its argument that Customs abused its discretion in extending the time for liquidation, Ford must establish that Customs "extended the period of liquidation 'with actual knowledge that no basis exist[ed] for so doing.'" (Def.'s Mem. in Opp'n at 22 (*quoting St. Paul Fire & Marine Ins. Co.,* 6 F.3d at 768 (Customs' decision to extend time for liquidation is entitled to a presumption of legality unless plaintiff can prove decision was unreasonable)).) Defendant concludes

[b]ecause there was an issue as to whether Ford knowingly misrepresented the character of the merchandise it entered into Commerce, Customs had a reasonable need for further information.

. . . .

Under these circumstances, *any* additional information that Customs uncovered in its section 1592 investigation would be relevant to the proper assessment of duties.

(Def.'s Mem. in Opp'n to Pl.'s Mot. to Compel Answers to Interrog. at 3.)

Defendant explains "aside from Ford's misrepresentations that completed cars and trucks were 'parts,' Customs was specifically concerned that Ford had improperly classified cars as trucks." (Def.'s Resp. to Pl.'s Fourth Set of Interrogs. & Req. for Admis. at 2 (*reprinted in* Pl.'s App. Ex. 21).) Defendant explains Ford's own employee testified that when he reviewed the entries, he discovered errors regarding the quantity of parts entered, the classification of the parts and their value. (*See* Def.'s Mem. in Opp'n at 22.) Defendant explains Customs was also investigating Ford's claims for classification under TSUS item 807.00 and that "[b]eyond this, the Customs Forms cf 214 and 216 allegedly submitted by Ford could not be located, and were only obtained pursuant to the section 1592 investigation. Finally, Customs could not account for the quantity of merchandise contained in Ford's requests for immediate release." (Def.'s Resp. to Pl.'s Fourth Set of Interrogs. & Req. for Admissions at 2–3 (*reprinted in* Pl.'s App. Ex. 21).) Defendant concludes "[a]ccordingly, it is plain that, at least in early 1986, further information was reasonably necessary for the proper classification and appraisement of the merchandise at issue." (Def.'s Mem. in Opp'n at 23.)

Defendant argues judicial precedent "has clearly established that, when an importer challenges Customs' extension of the time to liquidate entries of imported merchandise, the burden is on the importer, not the Government, to demonstrate that no possible grounds for such an extension existed." (*Id.*

at 3–4.) Defendant cites the recent decision of this Court in *A Classic Time v. United States*, 942 F.Supp. 589 (CIT 1996), *appeal docketed* 123 F.3d 1475 (Fed.Cir.1997), where the Court held Customs' actions in extending the time for liquidation was proper. In *A Classic Time*, the Court noted that the term "information" as used in 19 U.S.C. § 1504(b)(1) is to be construed broadly. *See A Classic Time*, 942 F.Supp. at 594 (*citing Detroit Zoological Soc'y v. United States*, 10 CIT 133, 138, 630 F.Supp. 1350, 1356–57 (1986)). The Court additionally noted the only limitation on Customs' discretion to extend a liquidation period is the elimination of all possible grounds for such an extension by the party challenging the extension. *Id.* (*citing St. Paul Fire & Marine Ins. Co.*, 6 F.3d at 768).

After considering the arguments of all parties, this Court finds Customs properly extended the time for liquidation of the eleven entries at issue. Pursuant to 19 U.S.C. § 1504(b) (1988), Customs is authorized to "extend the period in which to liquidate an entry ... if (1) information needed for the proper appraisement or classification of the merchandise is not available to the appropriate customs officer." The scope of 19 U.S.C. § 1504(b)(1) was considered in *Detroit Zoological Society v. United States*, 10 CIT 133, 630 F.Supp. 1350 (1986). In that case, the Court found Customs' extension was justified under § 1504(b)(1) and held "[t]he term 'information,' as it is used in the statute, 19 U.S.C. § 1504(b)(1) (1982) ... should be construed to include whatever is reasonably necessary for proper appraisement or classification of the merchandise involved." *Detroit Zoological Society*, 10 CIT at 138, 630 F.Supp. at 1356. The Court in *International Cargo & Sur. Ins. Co. v. United States*, 779 F.Supp. 174, 179 (CIT 1991) added "liquidation may be extended when the delay is motivated by the legitimate need for additional information from the government." As the Court said in *Detroit Zoological Society*, "ordinarily, the court should defer to Customs' determination that it needs additional information to liquidate an entry and

therefore requires an extension of the statutory time period." *Detroit Zoological Society*, 10 CIT at 138, 630 F.Supp. at 1357.

As a result of the above, the Court finds Customs acted properly in extending the time for liquidation of the entries while its investigation pursuant to 19 U.S.C. § 1592 continued and it gathered necessary information. Defendant has demonstrated Customs had legitimate purposes and a reasonable basis for extending the time for liquidation of the eleven entries and this Court therefore upholds the extensions.

## CONCLUSION

The Court holds Ford has not proven it is entitled to relief under 19 U.S.C. § 1520(c)(1) (1982) because it has not shown it made a mistake of fact, clerical error or other inadvertence in not claiming "PD" status for the entries at issue. The Court also finds Ford has failed to present sufficient evidence to overcome the presumption that Customs mailed the notices of extension of liquidation in this case. Finally, this Court rejects Ford's argument Customs had no legal basis to extend the liquidations in this case. As a result, the Court denies Ford's Motion for Summary Judgment and grants defendant's Motion for Summary Judgment.

## JUDGMENT ORDER

This case having been duly submitted for decision, and this Court, after due deliberation, having rendered a decision herein; now in conformity with said decision, it is hereby

**ORDERED** that plaintiff's Motion for Summary Judgment is denied; and it is further

**ORDERED** that defendant's Motion for Summary Judgment is granted.