**FORD MOTOR COMPANY,**
**Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

No. 98–1066.

United States Court of Appeals,
Federal Circuit.

Sept. 14, 1998.

850

R. Ted Cruz, Cooper, Carvin & Rosenthal, PLLC, Washington, DC, argued, for plaintiff–appellant. With him on the brief was Charles J. Cooper. Of counsel on the brief were C. Harry Gibson, Ford Motor Company, Dearborn, MI, and S. Richard Shostak, Stein, Shostak, Shostak & O'Hara, Los Angeles, CA.

Amy M. Rubin, Civil Division, Commercial Litigation Branch, International Trade Field Office, New York City, argued, for defendant–appellee. With her on the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, U.S. Department of Justice, Washington, DC, Joseph I. Liebman, Attorney in Charge, International Trade Field Office. Of counsel on the brief was Sheryl A. French, Office of Assistant Chief Counsel, International Trade Litigation, U.S. Customs Service, New York City.

Before MAYER, Chief Judge, and LOURIE and RADER, Circuit Judges.

RADER, Circuit Judge.

On summary judgment, the United States Court of International Trade upheld the United States Customs Service's (Customs') liquidation of duties on truck parts imported from one of Ford Motor Corporation's (Ford's) foreign trade subzones (FTSZs). *See* 979 F.Supp. 874 (Ct. Int'l Trade 1997). Because genuine issues of material fact prevent a determination of whether Customs abused its discretion in extending the time for liquidation, and whether Ford in fact committed a correctable "clerical error" under 19 U.S.C. § 1520(c)(1), this court vacates and remands.

## I.

For several years, Ford has manufactured cars (Bronco IIs) and trucks (Rangers) at its Louisville, Kentucky assembly plant. Ford has always imported foreign engines and transmissions for those cars and trucks. In the early 1980s, the separate subheadings of the Tariff Schedules of the United States (the TSUS) for engines and transmissions coincidentally set the duty rate for both imports at 3.3% *ad valorem*.[1] Notably, many— if not all—of the imported engines or transmissions fit interchangeably in either a car or a truck.

During the relevant times for this case, the duty rate for a completed car was lower than the engine and transmission duties—only 2.6%. The duty rate for a completed truck was much higher—25%. Consequently, in 1983, Ford applied to establish an FTSZ at its Louisville assembly plant. An FTSZ— though located on United States soil—receives treatment under the Customs laws as a territory outside of the United States. *See generally* 15 C.F.R. § 400.1(c) (1992). At an FTSZ, an importer "has a choice of paying duties either at the rate applicable to the foreign material in its condition as admitted into a zone, or if used in manufacturing or processing, to the emerging product." *Id.*; *see also Armco Steel Corp. v. Stans*, 431 F.2d 779, 782 (2d Cir.1970). Thus, by making its Louisville plant an FTSZ, Ford could pay the duty rate of 2.6% (for completed cars) on the imported engines and transmissions for cars, and could continue paying the duty rate of 3.3% on the imported parts for trucks. Ford estimated savings of about $15,000 per week at Louisville from this legal procedure. The parties do not dispute that this was Ford's objective.

To qualify for this treatment, however, regulations required Ford to conduct its operations in a specific manner. First, it had to identify each part entering the Louisville FTSZ as either a car part or a truck part. Ford then had to designate all car parts as "non-privileged foreign" merchandise and all truck parts as "privileged domestic" merchandise on a Customs Form 214 ("a

CF214"). An importer completes this form for every piece of foreign merchandise as it enters an FTSZ. *See* 19 C.F.R. § 146.12(a), (c)(1) (1985). To designate merchandise as either "non-privileged foreign" or "privileged domestic," the importer simply checks a box labeled with the corresponding designation. An importer must then handle designated merchandise within the FTSZ according to regulations. *See* 19 C.F.R. §§ 146.31, 146.32 (1985).

Duties on "non-privileged foreign" merchandise are not due and payable until the merchandise leaves the FTSZ. *See* 19 C.F.R. § 146.48(e) (1985); *see also* 19 C.F.R. § 146.23 (1985). Thus, Ford could defer payment of duties on the car parts until it had assembled them into completed cars—and thereby capture the rate for cars, rather than car parts. Duties for "privileged domestic" merchandise, on the other hand, are due and payable upon entry into the FTSZ. *See* 19 C.F.R. § 146.22(a) (1985); *see also* 19 C.F.R. § 146.44 (1985). Thus, the regulations required Ford to pay the duty on truck parts as they entered the FTSZ. For either of these two designations, payment must accompany Customs Form 7501 ("CF7501"), which identifies merchandise entering the commerce of the United States. *See* 19 C.F.R. §§ 143.12, 143.15 (1985). Thus, to successfully operate the Louisville FTSZ, Ford had to determine and designate the future usage of each part, and then, based on that usage, identify the correct FTSZ status and pay duty payments at the proper time. Ford also had to keep track of which parts had been given which designation—at least until they had properly been put into a car or a truck.

Ford assigned Mr. Elma D. ("Moe") Tullock to perform these tasks at the Louisville FTSZ. At various times, he carried the title "FTSZ Coordinator," "Foreign Trade Zone Representative," "Customs Representative," and "Foreign Trade Zone Agent." In this position, Tullock filled out the forms and forwarded them with appropriate payment to Customs officials. He also kept track of the parts and their designations at the plant. A

---

1. Although the duty rate was reduced to 3.2% during the relevant time period, for convenience this court will refer to the higher 3.3% as the applicable rate.

document identified as a manual for operating the Louisville FTSZ provides the following job description:

> The responsibility of the Ford FTZ Representative will be to coordinate the entire Ford Subzone operation to ensure that all internal operating procedures are completely satisfied and the required reports are presented to the U.S. Customs Service, Customs Broker and Department of Commerce on a timely basis. . . .

The parties dispute whether it was *also* Tullock's job to decide which parts would be placed in trucks and which in cars. Customs argues Tullock decided whether a given shipment of parts would be used for cars or for trucks. Ford asserts that Tullock's production supervisors decided the use of the parts and Tullock only placed the designations he received from supervisors in the proper paperwork. Ford, however, emphasizes that this factual dispute is immaterial to the outcome of this case. As it turns out, Ford is correct that this dispute is immaterial.

The parties also dispute to what extent Ford gave Tullock binding instructions on his FTSZ responsibilities. Ford contends that it gave Tullock, in writing, specific, and unambiguous, binding instructions: For every *car* part entering the FTSZ, Tullock was to check the "non-privileged foreign" box on a CF214, and, after the car was assembled, complete CF7501 and pay a 2.6% duty. For every *truck* part arriving at the FTSZ, he was to check the "privileged domestic" box on a CF214, and immediately complete CF7501 and pay a 3.3% duty. Customs, on the other hand, charges that Ford left Tullock, an employee with no prior FTSZ experience, virtually unsupervised with no binding instructions. Customs contends that it was Tullock's responsibility to decide how to implement the FTSZ regulations—at least in day-to-day operations—to carry out Ford's broad objective.

Ford activated the Louisville FTSZ in November 1985, but shut it down less than three months later. In that short time, the Louisville FTSZ produced and shipped eleven shipments of cars and trucks. Each shipment was a separate Customs entry. For each entry, Tullock had prepared and submitted CF7501 forms. Each form described the entering parts as "transmissions for trucks," "transmissions for autos," "engines for trucks," or "engines for autos." Moreover, each form asserted a 2.6% rate for the car parts and a 3.3% rate for the truck parts. However, the record shows that none of the CF214s had classified any of these parts as "privileged domestic" upon arrival at the FTSZ. Instead, every one of the nearly one hundred CF214s had *consistently* designated *all* of the entering engines and transmissions as "non-privileged foreign," even though the CF214s identified many of the engines and transmissions as engines or transmissions "for trucks." Tullock signed all of the CF7501s.[2]

The record *does not* show which truck parts on the CF214s correspond to the truck parts listed on the CF7501s. Nevertheless, both parties agree that Ford did not pay the 3.3% duty on truck parts listed on the CF7501s until *after* those parts had been assembled into trucks. In other words, Tullock had listed in the CF7501s truck parts that had already been assembled into trucks. Thus, Tullock had made two mistakes on truck parts: (1) he designated them as "non-privileged foreign" instead of "privileged domestic," and (2) he did not pay the 3.3% duty at the proper time.

When Ford shut the FTSZ down in February 1986, Customs asserted that Ford owed the 25% duty on all truck parts, because they had been designated "non-privileged foreign," no duty had been paid on them when they entered the FTSZ, and they had exited the FTSZ as parts of completed trucks. Customs began an investigation into the proper amount of duty. Mr. Richard McNally, the Customs agent in charge of the investigation, discovered that four of the entries also contained some merchandise classified as TSUS Item 807.00 ("American goods returned"). McNally felt that this classification was probably incorrect. He also raised

---

**2.** However, about half of the CF214s—specifically those with dates ranging from December 17, 1985 to January 30, 1986—were signed by a W.V. Posey. A contemporaneous document indicates that Posey provided Tullock with "clerical assistance."

questions about the quantities, values, and TSUS classifications for the truck and car parts, as well as whether Tullock had performed simple calculations correctly. Tullock's supervisors verified many of McNally's observations.

In July 1986, McNally prepared an internal report. The report concluded that the TSUS classifications for both the truck and car parts in the entries had been improper, that the proper duty rate on the truck parts was 25%, and that Ford owed approximately $5.3 million in additional duties. The report did not mention the Item 807.00 issue. Based on "the significant amount of duty involved," McNally referred the matter to Customs' Office of Enforcement. Consequently, in August 1986, Customs also began a civil fraud investigation under 19 U.S.C. § 1592. Over the next three years, Customs issued three one-year notices of extension to Ford under 19 U.S.C. § 1504(b)(1).[3]

In 1989, shortly before the end of the third extension period, Customs finally liquidated the eleven entries with a 25% duty on all parts asserted to be truck parts in the entries. Customs accepted Ford's assertions of 807.00 status. The total additional duty amounted to $5.4 million. Ford timely filed a protest in February 1990. The fraud investigation closed a month later.

Customs denied the protest in 1992. Ford then brought an action in the United States Court of International Trade to contest the denial. See 28 U.S.C. § 1581(a) (1988). Ford argued that the entries were liquidated "by operation of law" at the face amount of the original CF7501s, because Customs had no valid reason for granting itself any of the time extensions. See 19 U.S.C. § 1504(a), (b)(1) (1982). In the alternative, Ford claimed that Tullock's failure to properly designate truck parts on the CF214s and to pay the 3.3% duty upon arrival at the FTSZ was "a clerical error, mistake of fact, or other inadvertence not amounting to an error in the construction of a law." 19 U.S.C. § 1520(c)(1) (1982). If so, Ford would be entitled to correct the entries. See id.

On cross-motions for summary judgment, the Court of International Trade ruled in favor of Customs. The trial court determined that Customs acted properly in extending the time for liquidation. See 979 F.Supp. at 892. It also determined that Tullock's error could not be classified as "a clerical error, mistake of fact, or other inadvertence." See id. at 886. Ford appeals.

## II.

■■■ This court reviews a grant of summary judgment without deference. See Wolff Shoe Co. v. United States, 141 F.3d 1116, 1121 (Fed.Cir.1998). In other words, this court reapplies the same legal standard as the trial court to the same record that was before that court. See id. Summary judgment is appropriate when the record shows "no genuine issue as to any material fact" and entitlement of the moving party "to judgment as a matter of law." U.S.Ct. Int'l Trade R. 56(d). On summary judgment, the courts resolve all reasonable inferences in favor of the nonmoving party. See United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Due to the nature of the proceeding, courts do not make findings of fact on summary judgment. See Anderson v. Liberty Lobby, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

## III.

■■■ This court first addresses the trial court's ruling on whether Commerce properly extended the time for liquidation. Title 19 governs the amount of time that Customs had to liquidate these entries:

(a) **Liquidation.**—Except as provided in subsection (b) of this section, *an entry of merchandise not liquidated within one year ... shall be deemed liquidated at the rate of duty, value, quantity, and amount*

---

3. Before the trial court, Ford challenged whether Customs had actually sent these notices. The trial court granted summary judgment in favor of

Customs on this point. See 979 F.Supp. at 886–90. Ford does not contest this ruling on appeal.

*of duties asserted at the time of entry by the importer* ....

(b) **Extension.**—The Secretary may extend the period in which to liquidate an entry by giving notice of such extension to the importer ... in such form and manner as the Secretary shall prescribe in regulations, if—

(1) *information needed for the proper appraisement or classification of the merchandise is not available to the appropriate customs officer;*

(2) liquidation is suspended as required by statute or court order; or

(3) the importer ... requests such extension and shows good cause therefor.

19 U.S.C. § 1504(a), (b) (1982) (emphasis added). The statute limits the permissible reasons for a time extension. Without a valid extension, the statute deems imports liquidated at the face amount of the entries. Customs' regulations additionally require that any individual extension may not exceed one year. *See* 19 C.F.R. § 159.12(a)(1) (1985). Almost no circumstance justifies a delay in liquidation beyond four years. *See* 19 U.S.C. § 1504(d).

Customs invokes subsection (b)(1)—"information needed for the proper appraisement or classification of the merchandise [was] not available to the appropriate customs officer"—to justify all three of its time extensions. *Id.* § 1504(b)(1) (quoted *supra*). Ford contends that, at the very least, the last of the time extensions was improper, and consequently seeks to have the entries "deemed liquidated" under section 1504(a) at their face amounts.

■ In *St. Paul Fire & Marine Insurance Co. v. United States,* 6 F.3d 763 (Fed. Cir.1993), this court addressed the standard for weighing the propriety of Customs' liquidation extensions. The Court of International Trade can only rule an extension improper if Customs abused its discretion. *See id.* at 768. Because Customs enjoys a statutory presumption of correctness, *see* 28 U.S.C. § 2639(a)(1) (1994), an importer has the burden to prove by a preponderance of the evidence that Customs' decision to extend was "unreasonable." *St. Paul,* 6 F.3d at 768.

For example, "[e]xtending a period of liquidation with actual knowledge that no basis exists for so doing would be an abuse of Customs' discretion." *Id.* Thus, the Court of International Trade cannot uphold a decision to extend a liquidation if an importer "eliminate[s] all reasonable bases for making that decision." *Id.* In *St. Paul,* this court reversed a grant of summary judgment in an importer's favor, because in the face of evidence by Customs of its customary practices, the burden of persuasion required the importer to introduce affirmative evidence that Customs had not followed the customary practice. *See id.* at 769–70.

Here, the trial court granted summary judgment against Ford. *See* 979 F.Supp. at 890–92. Commerce supports that result with evidence showing that, even after the third extension, McNally needed further information from Ford and had further discrepancies in the entries to resolve. Commerce also points to the fraud investigation, asserting that its ongoing status provided adequate reason for the time extensions.

On the other hand, Ford contends that, despite some evidence of *need* for additional information, Customs did not *request* any information from Ford after mid–1986. Therefore, Ford argues that Customs' overall time in seeking additional information was unreasonable. Moreover, Ford challenges whether much of the information that Customs might have "needed" was for "appraisement" or "classification," the only type of information that the statute makes relevant to Customs' extension decision.

■ Construing the evidence in a light most favorable to Ford, as required on summary judgment, this court acknowledges that Ford has presented sufficient evidence to raise a triable issue of fact about the reasonableness of Customs' delay. The record shows that McNally met with Ford personnel in January 1986, February 1986, and June 1986 before drafting his report, and then again in February 1987. Customs did not meet with Ford after February 1987. A reasonable fact finder could determine that, as of McNally's July 1986 report, Customs had completed most of its work on appraisement and classification issues. Indeed, the

July 1986 report made a conclusion—albeit preliminarily—on those issues. Moreover, the total amount at which the entries were eventually liquidated is substantially the same as the amount McNally calculated in his July 1986 report.

McNally's deposition testimony does not help Customs show that it acted reasonably. When asked whether he expected additional information on classification and valuation of the entries after his July 1986 report, McNally answered affirmatively. When asked simply what that information was, however, he could not remember. Nor could he recall any specific instances when he requested information from Ford after his 1986 report. Instead, McNally concluded that he must have needed more information because he had waited to liquidate. This reasoning, of course, is quite circular: Customs delayed because it needed more information yet argues it must have needed more information because it delayed. Thus, a reasonable fact finder could determine that an additional three years was an unreasonable amount of time to finalize that work and therefore an abuse of Customs' discretion.

On summary judgment, Customs cannot prevail by showing only a need for additional information, because the record shows that Customs identified those needs three years earlier and apparently failed to act. For example, notes from a February 1989 Customs meeting show that McNally still needed to "[r]ectify discrepancies in figures" in the entries. This task relates to "appraisement" and "classification," but McNally had known he needed to perform this task three years earlier. Customs offers no explanation for taking three years to perform this task.

On summary judgment, Customs' need for information to evaluate 807.00 concerns also does not suffice to support a final judgment. In the first place, Customs' 807.00 concerns apply to only four of the eleven entries. More importantly, the record again suggests that a finder of fact could possibly find an unreasonable delay. After the January 1986 meeting, Tullock sent a letter enclosing some information on the 807.00 issue. A year later, notes from the February 1987 meeting indicate that Tullock agreed to furnish any

*additional* information for 807.00 status, and that McNally would request any necessary documents. Two years later, in February 1989, notes from an internal Customs meeting show that McNally still needed to request documents from Ford on the 807.00 issue. Although this evidence shows that McNally felt he needed more information, it also raises the question of why three years had passed without even a request to Ford for that information. Indeed, the record does not show that McNally ever requested more documents (e.g., per a Customs Form 29).

The record on summary judgment thus leaves open a genuine question about the reasonableness of Customs' delay on the 807.00 question. McNally told Ford in February 1987 that he wanted more documentation on the 807.00 issue. Nearly two years later, he still had not requested that documentation, let alone analyzed it. Both Tullock's January 1986 letter and Ford's prompt responses to other requests suggest that Ford would have fully cooperated with any timely request. In light of this record, a reasonable fact finder could determine that Customs did virtually nothing for nearly two years. A full airing of the facts may disclose that this delay was unreasonable and therefore an abuse of Customs' discretion.

■ Customs accurately notes that the statute does not require that information justifying a delay must come *from the importer.* A need for internal information from other Customs personnel might also satisfy section 1504(b)(1). In this vein, Customs raises the ongoing fraud investigation, contending that liquidation was not appropriate until completion of that investigation. Indeed, the trial court, in its careful opinion, relied on this ground to grant summary judgment, *see* 979 F.Supp. at 892, and after proper fact finding, Customs may well show that this ongoing investigation justified any delays.

At this preliminary summary judgment phase, however, the record does not show that the fraud investigation was reasonably expected to produce information about "appraisement" and "classification." In response to an interrogatory by Ford, the government objected on grounds that "the

substance of [Customs'] investigation of a possible violation of 19 U.S.C. § 1592 is irrelevant to the issues raised by plaintiff's complaint." Since then, Customs has reversed its stance. Moreover, even if Customs expected the investigation to turn up information relevant to appraisement and classification, that expectation alone cannot justify summary judgment. Like the delays on the 807.00 issue, the length of the fraud investigation is subject to scrutiny for reasonableness. For example, Customs' initial fraud investigator admitted that from August 1986 to November 1987, he had done nothing with respect to the 807.00 issue. In sum, this court does not question Customs' need for information, *per se,* but does question whether the record will show after a full airing that Customs took a reasonable amount of time to seek that information. Unreasonable delays in pursuing the investigation could show that Customs abused its discretion in seeking time extensions. This court does not presume to decide these issues, but does discern triable issues of fact on them.

## IV.

### A.

■■■ In the alternative, Ford contends that the errors in its entries are correctable under 19 U.S.C. § 1520(c)(1) (1982):

> Notwithstanding a valid protest was not filed, the appropriate customs officer may, in accordance with regulations prescribed by the Secretary, reliquidate an entry to correct—
>
> > (1) *a clerical error, mistake of fact, or other inadvertence not amounting to an error in the construction of a law,* adverse to the importer and manifest from the record or established by documentary evidence, in any entry, liquidation, or other customs transaction, when the error, mistake, or inadvertence is brought to the attention of the appropriate customs officer within one year after the date of liquidation or exaction. . . .

(Emphasis added.) The regulation implementing section 1520(c)(1) essentially parrots the statutory language. *See* 19 C.F.R. § 173.4(b) (1985). Title 19 thus allows the correction of errors made not only by employees of Customs, but also by employees of an importer. *See, e.g., Hambro Automotive Corp. v. United States,* 66 C.C.P.A. 113, 603 F.2d 850 (CCPA 1979). Thus, to the extent specified, these provisions modify the general rule of agency law that a principal is bound by the acts of its agents.

■■■ To begin with, this court addresses the requirements of title 19 for evaluating whether an error is correctable. In the first place, the party seeking to correct must show that its error fits within one of the statutory categories as a "clerical error," as a "mistake of fact," or as some "other inadvertence." The statute does not grant a universal right to correct any error that is not "an error in the construction of a law." Instead the statute specifies three categories that qualify for correction and then denies correction to "errors in the construction of a law" even if these legal construction errors fall within the three correctable categories. The three correctable categories are not mutually exclusive; some errors that qualify as one type may also qualify as another. Nevertheless, the statute contemplates that some errors that are prima facie correctable will also be "error[s] in the construction of a law." The statute precludes that subset of errors from correction. Consequently, for an error to be correctable, it must simultaneously qualify as at least one of the three enumerated types *and* not qualify as an "error in the construction of a law."

Ford attacks this interpretation of the correction clause by citing two cases: *Executone Information Systems v. United States,* 96 F.3d 1383, 1385 (Fed.Cir.1996) and *Hambro Automotive Corp. v. United States,* 66 C.C.P.A. 113, 603 F.2d 850 (CCPA 1979). In *Executone,* the entry papers for two entries did not contain a form required to qualify the entries for duty-free status. In the past, the foreign exporter had customarily provided such forms to the importer's broker. Customs liquidated the two entries, and the importer paid the duties. When the importer learned that the forms had been omitted, it requested that the exporter send the forms to its broker, that the broker file the forms

with Customs, and that the broker file a protest. For some reason, the broker delayed and did not file the forms until after the time to protest had expired, at which time it could only request that Customs correct the entries under section 1520(c)(1). The importer asserted that the cause of the failure to include the forms at entry was the exporter's inadvertent failure to provide the forms as usual. In evaluating the importer's claim, this court first looked to whether "the entries at issue resulted from an error in the construction of the law since that alone would prohibit application of section 1520(c)(1)." *Executone*, 96 F.3d at 1385. However, this court quickly determined the error alleged was not such an error. *See id.* at 1386. Instead, this court concluded that the importer had alleged a classic "mistake of fact" because it mistakenly thought the forms had been filed at entry. *See id.* at 1388. Nevertheless, this court denied the importer relief under section 1520(c)(1) because the importer had no evidence to prove the "mistake of fact" alleged, as opposed to "intentional or negligent inaction."

In this case, Ford invokes this court's statement in *Executone* that "an error in the construction of the law ... alone would prohibit application of section 1520(c)(1)." *Id.* at 1385 (quoted *supra*). Ford reads this statement as making this inquiry dispositive for every section 1520(c)(1) determination. Contrary to Ford's interpretation of *Executone*, this statement is entirely consistent with the construction of section 1520(c)(1) outlined above. If an error qualifies as an "error in the construction of a law," that inquiry is dispositive, but if it does not so qualify, the party seeking correction must still show that its error fits within one of the three correctable categories.

In *Hambro*, the importer alleged that its accountants had incorrectly calculated the value of merchandise in over eighty entries. The erroneous values were consistent with the accountants' having used general expenses and profits in the home market rather than those of the export market. The importer attributed this error to a "mistake of fact," i.e., a misunderstanding of the American accounting terms and expressions in a

Customs ruling on the subject. The Customs Court dismissed the importer's action for lack of subject matter jurisdiction, determining that challenges to all but three of the entries were untimely. *See Hambro Automotive Corp. v. United States*, 81 Cust.Ct. 29, 458 F.Supp. 1220, 1222 (Cust.Ct.1978). As for the three remaining entries, that court determined that the asserted errors were "not the type subject to correction" under section 1520(c)(1). *Id.*

On appeal, this court's predecessor, the Court of Customs and Patent Appeals, affirmed because the importer only proved that its accountants had misunderstood Customs' instructions. *See id.* 603 F.2d at 854–55. According to the court, the importer had not proven a mistake of fact, but had admitted a misunderstanding of the law.

*Hambro*'s treatment of the statute, however, does require some discussion. First, as the dissent in *Hambro* accurately recognized, the majority interchangeably used "error in the construction of a law" with "mistake of law." This implies that the two terms mean the same thing. *See id.* at 854 ("[W]e find nothing to substantiate that [the accountants'] errors ... were anything other than a mistake of law, expressly excluded by [section 1520(c)(1)]."); *id.* at 856 (Baldwin, J., dissenting) ("I cannot agree that the statutory provision 'error in the construction of the law' can be broadly construed and considered to be synonymous with 'mistake of law,' which the majority has done."). Second, the opinion quotes the statement that "[a] mistake of fact is any mistake except a mistake of law." *Id.* at 853 (quoting *C.J. Tower & Sons of Buffalo, Inc. v. United States*, 68 Cust.Ct. 17, 336 F.Supp. 1395, 1399 (Cust.Ct. 1972) (quoting Pomeroy, *Equity Jurisprudence* § 839 (1941)), *aff'd*, 61 C.C.P.A. 90, 499 F.2d 1277 (CCPA 1974)) (internal quotations omitted).

As a matter of logic, Ford advances, the sum of these two propositions means that all correctable errors qualify as "mistakes of fact." In other words, only to the extent that a "clerical error" or an "inadvertence" can *also* be classified as a "mistake of fact" is such an error correctable. According to Ford's reading and logic, if something is not

a "mistake of fact," then it is a mistake of law. Furthermore, a mistake of law is the same as an "error in the construction of a law" and may not be corrected. Therefore, Ford reasons, anything that is not a "mistake of fact" is not correctable.

■ Ford's reasoning has one immediately recognizable problem—the statute. The statute lists three types of prima facie correctable errors. According to Ford, any listing beyond a "mistake of fact" is superfluous. This court declines to strike words from a statute based on a misguided reading of dicta from case law. Stated directly, Ford reads far too much into the dicta from *Hambro* noting that "[a] mistake of fact is any mistake except a mistake of law." *Id.* 603 F.2d at 853 (internal quotations omitted).

In the first place, as already noted, this statement is dictum. The statement is dicta because our predecessor court in *Hambro* decided that the importer committed "an error in the construction of a law." To reach that conclusion, our predecessor had no need to construe or define "mistakes of fact." More important, Ford distorts the meaning of this passage by taking it out of context. In context, the statement reads:

A mistake of fact is any mistake except a mistake of law. It has been defined as a mistake which takes place when some fact which indeed exists is unknown, or a fact which is thought to exist, in reality does not exist. A mistake of fact exists where a person understands the facts to be other than they are, whereas a mistake of law exists where a person knows the facts as they really are but has a mistaken belief as to the legal consequences of those facts.

Inadvertence, on the other hand, is a word of broad meaning. It has been defined variously as an oversight or involuntary accident, or the result of inattention or carelessness, and even as a type of mistake. It is thus language broader in scope than mistake.

*Id.* at 853–54 (citations and internal quotations omitted) (quoting *C.J. Tower & Sons of Buffalo, Inc. v. United States,* 68 Cust.Ct. 17, 336 F.Supp. 1395, 1399 (Cust.Ct.1972) (some citations omitted), *aff'd,* 61 C.C.P.A. 90, 499 F.2d 1277 (CCPA 1974)).

As the complete passage indicates, the court in *Hambro* recognized that "inadvertence" is "broader in scope than mistake." *Id.* at 854. If inadvertence is "broader" than mistake, then an inadvertent mistake could qualify for correction without also fitting within the category of mistake of fact. Ford presumes too much when it assumes that all correctable errors also qualify as "mistakes of fact." Rather, *Hambro* clarifies that a misreading of instructions *provided by Customs* is "an error in the construction of a law." *Hambro* also clarifies that "an error in the construction of a law" is the same as a "mistake of law." *Hambro* does not purport to confine the universe of correctable errors to mistakes of fact.

**B.**

Having addressed the proper construction of section 1520(c)(1) and the meaning of "an error in the construction of a law," this court now turns to when an error can amount to "a clerical error, mistake of fact, or other inadvertence." In the case of *S. Yamada v. United States,* 26 C.C.P.A. 89, 1938 WL 4052 (1938), the Court of Customs and Patent Appeals dealt with the concept of "clerical errors." Indeed, *Yamada* provides a well-reasoned definition for that term.

*Yamada* involved errors by a brokerage firm. A supervisor at the firm gave a broker a certain certificate and instructed him to file it with 100 entries for the importer. As it turns out, the broker had been using a similar certificate—but different in certain (critical) specifics—for another task. Somehow, the two sets of certificates were commingled. Consequently, the broker attached incorrect certificates to 35 of the importer's 100 entries. Although intending to attach the certificates supplied by his supervisor, the broker admitted some lack of care in attaching the wrong form. The trial court held there was no "clerical error."

■ On appeal, the Court of Customs and Patent Appeals reversed. Customs argued that because the broker had been "careless and indifferent," he could not claim that he made a clerical error. The court

responded: "It is our view that clerical error is *usually* the result of carelessness." *Yamada,* 26 C.C.P.A. at 94 (emphasis added). It then quoted with approval the opinion in *Morimura Bros. v. United States,* 160 F. 280 (C.C.S.D.N.Y.1908) (citations and internal quotations omitted):

> Clerical error implies negligence or carelessness; but the question is: Whose is the negligence? If it is that of a "clerk, writer, or copyist," it is clerical error. The expression assumes that the mistake or negligence or carelessness is that of one engaged in the subordinate service of transcription, copying, or comparison; a labor not requiring original thought.

This court's predecessor then emphasized that the broker in *Yamada* "intended to carry out the instructions of [his superior]," but:

> Through carelessness, inadvertence, and mistake, his proper intention was improperly executed. It was not the error of the party in interest or of [the supervisor]. *It was the error of one upon whom no duty devolved to exercise original thought or judgment* in determining [what the substance of the certificate should be].... This had been done for him by another whose instructions presumably he was required to follow, and he intended to do so.

*Yamada,* 26 C.C.P.A. at 94 (emphasis added). As such, the court concluded that the broker's error was properly classified as a "clerical error." Thus, *Yamada* teaches that a subordinate acting contrary to binding instructions commits a clerical error. When a subordinate is given binding instructions on particular aspects of a task, no duty devolves upon him to exercise discretion or judgment in carrying out those aspects.

As noted above, Tullock erred by designating known truck parts with "non-privileged foreign" instead of "privileged domestic" status, and by failing to pay the 3.3% truck duty at the proper time. According to *Yamada,* if Tullock was "one upon whom no duty devolved to exercise original thought or judgment" in assigning an import status to truck parts or in determining when to make payments, his errors are "clerical errors." Customs opposes this view of the law, but does not offer any alternative. Customs instead

responds that "[a]n importer must bear the responsibility for the actions of its employees if Customs laws are to have any meaning." The general law of agency indeed attributes the actions of an employee within the scope of his authority to his employer, but section 1520(c)(1) amends that general rule to some extent.

■ Of note, however, is *Yamada*'s statement that the error in the entries "was not the error of the party in interest or of [the supervisor]." If the error had indeed been due in some measure to the party in interest or the supervisor—those upon whom a duty did devolve "to exercise original thought or judgment" in the matter—then making a correction would amount to more than correcting "a clerical error." Therefore, even if an importer establishes the presence of a "clerical error," Customs may show that the error is not correctable by showing that a noncorrectable error of those who did have discretion in the matter contributed to the mistake.

■ In any event, Tullock's error cannot qualify as an "inadvertence." The facts of *Yamada* illustrate at least one distinction between "clerical error" and "inadvertence." The definition of "inadvertence" set forth in *Hambro* was "an oversight or involuntary accident, or the result of inattention or carelessness." *Hambro,* 603 F.2d at 854 (quoting *C.J. Tower & Sons of Buffalo, Inc. v. United States,* 68 Cust.Ct. 17, 336 F.Supp. 1395, 1399 (Cust.Ct.1972), *aff'd,* 61 C.C.P.A. 90, 499 F.2d 1277 (CCPA 1974)). In addition, "inadvertence" does not stretch so far as to encompass intentional or negligent inaction. *See Aviall of Texas, Inc. v. United States,* 70 F.3d 1248, 1250 (Fed.Cir.1995); *Executone,* 96 F.3d at 1389–90. In *Yamada,* the court characterized the broker's error as both a "clerical error" *and* as an "inadvertence." *See* 26 CCPA at 94, 95. As the *Yamada* court explained, the reason for the first characterization is that the broker had no discretion to choose which certificate to file with the entries. The reason for the second characterization is that the broker completely understood his instructions, but was "careless" in carrying them out. Ford alleges that Tullock also erred in a task for which he had

no discretion. However, according to Ford, Tullock garbled his instructions and therefore consistently—not carelessly—did not carry them out. Thus, if Ford's characterization of the facts is correct, Tullock's mistake might qualify as a "clerical error," but not as an "inadvertence."

### V.

The record raises material issues of fact that bear on whether Tullock's mistakes are correctable. Specifically, the record shows a dispute over whether Tullock's supervisors provided him with complete instructions, i.e., instructions covering and binding Tullock in the aspects in which he erred. In addition, the record shows a dispute over whether Tullock's supervisors made uncorrectable contributing errors, so as to preclude the correction of what otherwise might be correctable errors on the part of Tullock.

 The record contains some evidence that Tullock's supervisors gave him complete instructions, but the record leaves room for the view that the instructions were lacking in several relevant specifics. To demonstrate that Tullock committed a "clerical error," Ford must prove that he was given complete, binding, non-discretionary instructions, as stated above, to the following effect: For every *car* part entering the FTSZ, Tullock was to check the "non-privileged foreign" box on a CF214, and after the car was assembled, complete CF7501 and pay a 2.6% duty. For every *truck* part arriving at the FTSZ, he was to check the "privileged domestic" box on a CF214, and immediately complete CF7501 and pay a 3.3% duty.

The record contains a document identified as a manual for supervising a foreign trade zone. It is entitled "Ford Foreign Trade Subzone: Louisville Assembly Plant" and has sections entitled "Operating Procedure for Subzone" and "Reporting Requirements." The document, however, lacks several critical specifics. For example, it does not explain what is to be done with "privileged domestic" merchandise, nor does it associate that status with parts for trucks. Moreover, it does not explain the timing of payments, the marking of CF214s, or the completion of CF7501s.

The record also contains another document, that Ford identifies as instructions to Tullock. Notations on the document show that it was also prepared by the Ford Customs and Drawback Section on July 3, 1984. That document states:

> Because of the [interchangeability of parts], and our desire to preserve the lower parts duty rate, as opposed to the duty rate on trucks, we propose to control the common parts as follows:
>
> — At the time of admission into the subzone we would seek a status designation of privileged domestic (PD) for the forecasted commercial vehicle usage and a status designation of non-privileged foreign (NPF) for parts forecast to be used in the production of passenger vehicles.
>
> — Duty would be paid on the parts designated as PD at the time of admission.
>
> — Duty on NPF parts would be tendered at the time of entry for consumption.

This passage provides a fairly complete description of Tullock's supposed duties. However, the deposition testimony of two Ford employees makes it clear that this document was *not* a set of instructions for Tullock. Mr. Lars Anderson, though not Tullock's immediate supervisor, was the coordinator of all of Ford's FTSZs and therefore Tullock's immediate advisor on FTSZ issues. Anderson's supervisor was Mr. Allen Moody. Both men worked in Ford's Customs and Drawback Section and provided assistance to Tullock. When asked about this document, Moody identified himself as its author. He further testified that this was *not* a set of instructions for Louisville, but was instead a letter outlining a proposal to Customs for operating the Louisville FTSZ. As it turns out, Customs rejected the proposal. Anderson corroborated Moody's testimony.

Ford still further points to Tullock's February 1990 affidavit [4] and two memos written

---

4. Shortly before Ford filed its protest in Febru- ary 1990, Tullock signed an affidavit concerning

by Tullock in January 1985. Tullock's affidavit states:

> There were numerous meetings prior to the start-up of our foreign-trade subzone.... From the beginning, we stated that passenger automobiles and trucks would be assembled in the Ford foreign-trade subzone and that truck parts would be duty paid and placed in privileged domestic status as evidenced by the memorandum dated July 3, 1984, from the Ford Customs and Drawback Section, Ford Head–Quarters....
>
> I was provided documentation and training on foreign-trade zones by Ford. I also visited our Wayne FTSZ in January 1984 and our Wixom FTSZ in November 1984. I was given specific instructions by Ford Customs and Drawback Section officials as to how to handle truck production in the FTSZ.
>
> ....
>
> I have no explanation as to exactly how the wrong foreign-trade zone status designation was placed on the form 214. I was aware that the intent of the operation was to pay a duty rate of 3.5% [sic] on parts used for Ranger production. I felt at the time I had been trained in the proper preparation of the documentation, and was unaware that documentation as submitted would fail to achieve this end.

This affidavit suggests that Tullock's supervisors gave him instructions on "how to handle truck production in the FTSZ." Moody's deposition corroborates that Tullock received instructions in person and over the phone. Although Tullock's affidavit does not contain specifics as to what those instructions were, two memos that Tullock wrote in January 1985 show that—at least at that time—he understood the correct procedure. Tullock sent one of those memos to Mr. William Kuchenbrod, his immediate supervisor. It stated:

> [W]e are awaiting final approval ... before we can begin operating Louisville Assembly Plant as a foreign trade zone.
>
> ....

> We must ... establish a beginning inventory on the controlled parts with the assistance of customs personnel. At this time, all inventory on hand including all inventory released at port of entry will be considered PD ["privileged domestic"] material; that is, material on which all required duty has been paid. I will open entries on the NPF ["non-privileged foreign"] Master covering each part....
>
> *As these subsequent receivals enter the subzone, I will pay duty @ $.033 and request immediate transfer from zone on controlled material to be used in Ranger production. As units are produced, I will pay duty @ $.026 on material used in Bronco production.*

(emphasis added).

This memo is evidence that Tullock—at least at one time—understood the correct procedure. It demonstrates an understanding of the correct duty rates, the correct timing of payment, and the difference between the two status designations. Although the statement does not specifically say that truck parts should be given "privileged domestic" status, it does state that the duty on truck parts should be paid as they are received at the subzone. And the prior paragraph makes clear that "privileged domestic" material is "material on which all required duty has been paid." Although the memorandum could be more clear, it lays the foundation for a reasonable inference that Tullock understood the correct procedure.

Given Tullock's affidavit and Moody's deposition testimony that Tullock received instructions, a reasonable fact finder might infer that those instructions contained the equivalent of the procedure that Tullock described in his January 1985 memo. Moreover, when instructions are in fact given, a fact finder might reasonably infer that those instructions are binding and provide for no discretion. Moody testified that "Mr. Tullock had no discretion to do anything other than to enter truck parts as PD ['privileged domestic'] merchandise.... That was his

---

the botched Louisville FTSZ operation. However, in January 1991, he simultaneously contracted myeloencephalitis and spinal meningitis, and

was hospitalized. His deposition testimony established that, as a result, he currently has no memory of the events in question.

instructions [sic] from our office." Anderson testified to the same effect.

Of course, these are inferences in the context of summary judgment, not actual findings of fact. The record also contains evidence contrary to those inferences which a fact finder must consider in reaching a judgment after trial. For instance, the consistency of Tullock's errors itself raises a reasonable inference that Tullock did not receive proper instructions. Moreover, Moody and Anderson present some conflicting testimony about what instructions Tullock actually received. For example, Moody testified that he had instructed Tullock that *any* parts that were interchangeable between cars and trucks should be declared "privileged domestic" and have duties paid up front. This testimony may be significant because Moody was aware that at least some of the parts at Louisville were interchangeable as he had explained in his rejected proposal to Customs. Moody also acknowledged that the manual did not deal with "privileged domestic" goods, but in the process suggested that there were no instructions at all on that point.

A fully developed record may also show that Tullock's supervisors made mistakes of law or other uncorrectable errors that contributed to Tullock's mistakes. For example, both Moody and Anderson vacillated in their deposition testimony on whether a CF214 had to be filled out in order to enter "privileged domestic" merchandise into the FTSZ and whether the regulations required Ford to track such merchandise within the FTSZ. Because they were Tullock's supervisors, their confusion on this point, if any, might have caused Tullock to get inaccurate or incomplete instructions. If so, the supervisors' mistake of law would mean that the entries are not correctable under section 1520(c)(1).

In addition, the record contains little evidence of adequate supervision for Tullock. For example, Kuchenbrod, Tullock's immediate supervisor, testified that he left Tullock

completely unsupervised, believing that Moody and Anderson had adequately informed Tullock and were available to answer his questions. Even if Tullock received proper and complete instructions, if negligent supervision was a contributing factor to Tullock's error, the error is not correctable under section 1520(c)(1). On remand, the parties will have an opportunity to present evidence on all of these points.[5]

## VI.

For the foregoing reasons, this court vacates the judgment of the Court of International Trade and remands for further proceedings consistent with this opinion.

### COSTS

Each party shall bear its own costs.

*VACATED AND REMANDED.*

---

5. This court notes that Customs has questioned whether Ford's record keeping system was adequate. Ford argues that Customs did not timely raise the issue below, but the trial court declined to address it. *See* 979 F.Supp. at 883 n. 5. This court leaves it to the trial court on remand to pass on the relevance and timeliness of this point.