# United States Court of Appeals for the Federal Circuit

2008-1212, -1234

ESSO STANDARD OIL CO. (PR),

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Cross Appellant.


Curtis W. Knauss, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, New York, argued for plaintiff-appellant. With him on the brief were Robert B. Silverman, and Robert F. Seely.

Tara K. Hogan, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-cross appellant. With her on the brief were Jeanne E. Davidson, Director, Todd M. Hughes, Deputy Director.

Appealed from: United States Court of International Trade

Chief Judge Jane A. Restani

# United States Court of Appeals for the Federal Circuit

2008-1212, -1234

ESSO STANDARD OIL CO. (PR),

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Cross Appellant.

Appeals from the United States Court of International Trade in case no. 98-02814, Chief Judge Jane A. Restani.

_____

DECIDED: March 16, 2009

_____

Before LOURIE, RADER, and LINN, Circuit Judges.

LINN, Circuit Judge.

Esso Standard Oil Co. (PR) ("Esso") appeals from the grant of summary judgment by the U.S. Court of International Trade affirming the refusal by the U.S. Customs Service, now the U.S. Bureau of Customs and Border Protection ("Customs"), to refund Esso for its overpayment of Harbor Maintenance Tax ("HMT") on entries covered by protest number 4909-97-100059 ("the '59 protest"). Esso Standard Oil Co. (PR) v. United States, No. 98-09-02318, 2007 WL 4570816 (Ct. Int'l Trade Dec. 28, 2007) ("Judgment"). Customs cross-appeals from the portion of the judgment ordering Customs to refund Esso for its overpayment of HMT on entries covered by protest numbers 4909-97-100057 and 4909-97-100058 (collectively "the '57 and '58 protests"). We conclude that the trial court correctly determined that Esso's refund request with

respect to the '59 protest is time-barred, but that it incorrectly determined that Esso's overpayments covered by the '57 and '58 protests are correctable errors under 19 U.S.C. § 1520(c).[1]  Thus, we affirm-in-part and reverse-in-part.

BACKGROUND

I

HMT is a user fee imposed on "port use" by commercial vessels, 26 U.S.C. § 4461(a) (2000), and is assessed as an ad valorem charge equal to 0.125 percent of the value of the vessels' commercial cargo, id. § 4461(b).  See generally Water Resources Development Act of 1986, 26 U.S.C. §§ 4461-62, Pub. L. 99-662, 100 Stat. 4082 (effective April 1, 1987).[2]  Congress intended the HMT to help finance the general maintenance and improvement of ports in the United States.  S. Rep. No. 99-126, at 9-10 (1985), as reprinted in 1986 U.S.C.C.A.N. 6639, 6640-47.  As originally enacted, the statute imposed no HMT on domestic cargo (excluding crude oil with respect to Alaska) shipped between the United States mainland and Alaska, Hawaii, or any U.S. possession.  26 U.S.C. § 4462(b) (1987).  By its terms, however, the original statute did not exempt domestic cargo shipped between Alaska, Hawaii, and the U.S. possessions themselves.

---

[1]     Section 1520(c) was repealed on December 3, 2004.  Pub. L. No. 108-429, § 2105, 118 Stat. 2434, 2598 (2004).  All entries in this action predate the effective date of the repeal.  Citations refer to the 1997 version unless otherwise noted.

[2]     The provision applying HMT to exports was held unconstitutional in United States v. U.S. Shoe Corp., 523 U.S. 360, 370 (1998).  We later upheld the constitutionality of the HMT as applied to imports and domestic unloadings in Thomson Multimedia Inc. v. United States, 340 F.3d 1355, 1366-67 (Fed. Cir. 2003).

To allievate the tax burden on domestic shipping between these ports, Congress amended the statute on November 10, 1988, adding the phrase "Alaska, Hawaii, or such a possession" to § 4462(b)(1)(B), and thus exempting from HMT the following:

> (A)  cargo loaded on a vessel in a port in the United States mainland for transportation to Alaska, Hawaii, or any possession of the United States for ultimate use or consumption in Alaska, Hawaii, or any possession of the United States,
>
> (B)  cargo loaded on a vessel in Alaska, Hawaii, or any possession of the United States for transportation to the United States mainland, <u>Alaska, Hawaii, or such a possession</u> for ultimate use or consumption in the United States mainland, <u>Alaska, Hawaii, or such a possession,</u>
>
> (C)  the unloading of cargo described in subparagraph (A) or (B) in Alaska, Hawaii, or any possession of the United States, or in the United States mainland, respectively . . . .

26 U.S.C. § 4462(b)(1), Pub. L. No. 100-647, § 2002(b), 102 Stat. 3342, 3597 (1988) (amendment emphasized).  The amendment was made retroactive to April 1, 1987, the effective date of the original statute.

Although the statute is largely self-executing, Customs is charged with administering the HMT statute and is authorized to promulgate regulations for carrying out the purposes of the statute.  <u>Id.</u> § 4462(i).  When the statute was originally enacted in 1987, Customs quickly promulgated regulations that same year.  But Customs has never updated its regulations to reflect the statutory exemption for shipments between Alaska, Hawaii, and U.S. possessions enacted by Congress with the 1988 amendment to § 4462(b).  To this day, the relevant Customs regulation embodies the 1987 version of § 4462(b)(1)(B).  <u>Compare</u> 19 C.F.R. § 24.24(c)(4)(i)(B) (1987) (exempting "[c]argo loaded on a vessel in Alaska, Hawaii, or any possession of the U.S. for transportation to

the U.S. mainland for ultimate use or consumption in the U.S. mainland") (emphases added), with 19 C.F.R. § 24.24(c)(4)(i)(B) (2008) (same).

II

Between 1993 and 1997, Esso shipped petroleum products from the U.S. Virgin Islands and unloaded those products in Puerto Rico.[3]  Esso submitted to Customs a total of eighty-seven entries for liquidation, in which Esso declared and paid certain import duties and fees, including over $339,000 in HMT.  Esso submitted those entries electronically using the Automated Broker Interface ("ABI") entry filing system, a software program that is sold and maintained by outside vendors.  Esso does not dispute that it knew that it was making the HMT payments at the time of each entry.  Indeed, the HMT payments are listed as separate line items on each of Esso's entry summaries (Customs Form 7501), which also specify the amount paid.  Customs then liquidated those entries between 1994 and 1997, as entered by Esso, without change and, consequently, without refunding the HMT.

Not until May 16, 1997 did Esso realize that possession-to-possession shipments had been exempted from HMT under the 1988 statutory amendment.  Esso then filed three requests for HMT refunds, all more than ninety days after the relevant liquidations.  Because these requests would have constituted untimely protests under 19 U.S.C. § 1514,[4] Customs classified Esso's requests as "requests for reliquidation" under 19

---

    [3]    Customs regulations existing since 1987 classified both the U.S. Virgin Islands and Puerto Rico as "possessions" of the United States for purposes of the HMT. See 19 C.F.R. § 24.24(c)(4)(ii)(C) (1987).

    [4]    In 2004, Congress extended the protest deadline from 90 to 180 days.  19 U.S.C. § 1514(c)(3), amended by Pub. L. No. 108-429, § 2103(2)(B)(iii), 118 Stat. 2434, 2598 (2004).  Citations refer to the 1997 version unless otherwise noted.

U.S.C. § 1520(c). Esso's first request, corresponding to the '57 protest, was filed on June 9, 1997 and covered two entries submitted on February 28, 1997 and March 19, 1997 and liquidated on June 20, 1997 and July 7, 1997. Esso's second request, corresponding to the '58 protest, was filed on June 13, 1997 and covered sixteen entries submitted between June 28, 1995 and October 5, 1996 and liquidated between June 21, 1996 and February 28, 1997. Esso's third request, corresponding to the '59 protest, was filed on August 25, 1997 and covered sixty-nine entries submitted between October 3, 1993 and February 6, 1996 and liquidated between March 18, 1994 and May 24, 1996. Customs denied all three requests under § 1520(c)(1).

On November 18, 1997, Esso timely protested the denial of its three reliquidation requests pursuant to 19 U.S.C. § 1514(a)(7). The stated basis for Esso's protests was that "on May 16, 1997 . . . it came to our attention for the first time that commercial cargo shipped by vessel from the U.S. Virgin Islands to the port of San Juan, Puerto Rico . . . was no longer subject to the payment of Harbor Maintenance Tax." App. for Defendant-Cross Appellant at 40. Esso further argued that its overpayment was a correctable mistake of fact, not an error in the construction of a law, because Esso had relied on "the erroneous implementation and enforcement of the Harbor Maintenance Tax law as implemented and enforced by Customs via ABI and customs liquidators." Id. at 41. Esso alleged that the ABI software, like Customs's regulations themselves, had not been updated to reflect the 1988 amendment to the HMT statute exempting possession-to-possession shipments.

On March 18, 1998, Customs denied all three protests. Customs ruled that Esso's overpayment of HMT, as well as Customs's subsequent liquidation of the entries

without refunding the HMT, was a mistake of law, which cannot be corrected under 19 U.S.C. § 1520(c)(1). The ruling stated that "Customs in San Juan was aware that the entries covered movements between two insular possessions but incorrectly believed that these movements were subject to the HMT. This is a mistake of law which is not correctable under 19 U.S.C. § 1520(c)(1)." App. for Defendant-Cross Appellant at 46. In the alternative, Customs found that the '59 protest should also be denied because Esso failed to notify Customs of the mistake within one year of liquidation, as required under § 1520(c)(1).

III

On September 24, 1998, Esso challenged the denial of its protests in the Court of International Trade. On cross-motions for summary judgment, the trial court held that Esso's payment of HMT was a correctable "inadvertence" under § 1520(c)(1) stemming from Customs's decades-long failure to amend its regulations to reflect the 1988 statutory amendment. Esso Standard Oil Co. (PR) v. United States, No. 98-09-02318, slip op. at 7, 2007 WL 4125999 at *3 (Ct. Int'l Trade Nov. 20, 2007) ("Summary Judgment") ("Customs slipped up by not implementing the statute, and plaintiff did not discover its slipup. This is clearly a case of inadvertence."). The trial court rejected the government's argument that this was a mistake of law, concluding that "[n]o one construed the law. Customs just did not implement the law it clearly knew was applicable and it took no steps which would permit the law to function as it should." Id. at 8. Regarding the '59 protest, however, the trial court agreed with the government that Esso's refund request was time-barred because the error had not been brought to Customs's attention within one year of the last liquidation covered by the '59 protest.

2008-1212, -1234                    6

<u>Judgment</u>, slip op. at 2. Accordingly, the trial court ordered Customs to refund all HMT erroneously paid on entries covered by the '57 and '58 protests.

Both parties appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## DISCUSSION

"We review the Court of International Trade's grant of summary judgment de novo, including by deciding de novo the proper interpretation of governing statutes and regulations." <u>Shinyei Corp. of Am. v. United States</u>, 524 F.3d 1274, 1282 (Fed. Cir. 2008). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ct. Int'l Trade R. 56(c).

### I. The '59 Protest

On appeal, Esso challenges the trial court's decision to sustain the denial of the '59 protest in view of Esso's failure to bring the alleged mistake to Customs's attention within the one-year time limit of § 1520(c)(1). Esso does not dispute that it first notified Customs of the erroneous HMT payments covered by the '59 protest on August 25, 1997, more than one year after the relevant entries were liquidated between March 18, 1994 and May 24, 1996. Esso's contention is not that its request met the time limits for challenging a liquidation under either § 1514(c)(3)(A) (protest within ninety days of liquidation) or § 1520(c)(1) (request for reliquidation within one year of liquidation). Rather, in an attempt to avoid this time-bar, Esso seeks to largely avoid the import protest procedures of §§ 1514, 1520(c) altogether.

Esso argues that its refund request was timely by virtue of: (1) the retroactivity of the 1988 amendment; (2) the absence of time limits in Customs regulation 19 C.F.R. § 24.24(e)(5); (3) a Customs HQ telex alleged to create a refund procedure without time limits; (4) Esso's timely protest of an alleged "exaction"; and (5) equitable tolling. For the reasons stated below, we hold that none of these theories excuses Esso's failure to file a protest within ninety days of liquidation or to notify Customs of the erroneous HMT payment within one year of liquidation.

A

First, Esso points out that the 1988 amendment, Pub. L. No. 100-647, § 2002(b), enacted on November 10, 1988, was made retroactive to April 1, 1987, which is more than one year before the amendment was enacted. In Esso's view, the 1988 amendment necessarily applied to merchandise that had been entered and liquidated outside of the one-year time limit of 19 U.S.C. § 1520(c)(1). Esso relies on a decision of our predecessor court which held that a request for reliquidation under § 1520(c)(1), although requested after the expiration of that provision's time limit, was nevertheless proper where a statutory amendment applied retroactively to exempt an importer's pre-amendment entries. United States v. Miles, 416 F.2d 973, 976 (CCPA 1969). That case is distinguishable. In Miles, the merchandise was entered and liquidated after the effective date of the amendment, Pub. L. No. 89-468, 80 Stat. 218 (effective February 8, 1966), but before the amendment was enacted on June 23, 1966. Miles, 416 F.2d at 974. Moreover, because the entries were liquidated more than sixty days before the amendment's enactment, the importer would have had no recourse under former § 1514 (setting a sixty-day time limit) or former § 1520(c)(1) (same). The Court of

Customs and Patent Appeals thus held that the amendment's express intent—to "apply to articles entered . . . for consumption after February 8, 1966"—entitled the importer to reliquidation of entries made prior to the June 23, 1966 amendment. Miles, 416 F.2d at 975 (quoting Pub. L. No. 89-468, § 2, 80 Stat. at 219). Rather than granting an unfettered right to reliquidate all subsequent entries, however, the court limited its holding to merchandise "entered between the specified dates," i.e., between the effective date and the amendment date. Id.

By contrast, Esso's '59 protest covers entries that were entered and liquidated nearly five years after the 1988 amendment. The timing of the amendment therefore did not preclude Esso from filing a protest under § 1514 or from bringing the error to Customs's attention under § 1520(c) within the time limits of those provisions. Because these avenues were available to Esso at the time of liquidation, we see no reason why the 1988 amendment would create a separate cause of action covering merchandise entered long after the date on which the statute was amended.[5]

B

Second, Esso contends that a prior Customs refund procedure, 19 C.F.R. § 24.24(e)(5) (1997), which at that time had no time limits, applied not only to quarterly payers who pay HMT on a quarterly basis, but also to importers, like Esso, who pay HMT at the time of formal entry. In 1997, the regulation provided:

> Where a refund is requested or a supplemental payment is made, a Harbor Maintenance Fee Amended <u>Quarterly</u>

---

[5]     Because Esso's entries were entered and liquidated after the 1988 amendment, we need not decide whether Congress intended Pub. L. No. 100-647, § 2002(b) to create "a new cause of action and the concomitant right to reliquidation" of entries predating the amendment. Miles, 416 F.2d at 976.

Summary Report, Customs Form 350, should be mailed to the U.S. Customs Service, P.O. Box 70915, Chicago, Illinois 60673-0915, along with a copy of the Harbor Maintenance Fee <u>Quarterly</u> Summary Report, Customs Form 349, for the <u>quarter</u>(s) in which the refund is requested or a supplemental payment is made.

<u>Id.</u> (emphases added). The trial court held that even a cursory reading of this regulation made evident that this refund procedure applied to quarterly payers, not importers. <u>Summary Judgment</u>, slip op. at 5.

We agree with the trial court that this avenue was not available to Esso. Even before Customs amended the regulation in 2001 to expressly require importers to seek HMT refunds through the regular import protest procedures, <u>see</u> 19 C.F.R. § 24.24(e)(4)(i) (2002), we believe that the 1997 refund procedure did not apply to importers. By its terms, the 1997 regulation required each HMT refund request to include a copy of Customs Form 350—a form created by Customs in 1991 "to be used by <u>quarterly payers</u> when requesting a refund (overpayment of the harbor maintenance fee) or to make a supplemental payment (underpayment of the harbor maintenance fee)." Customs Regulations Amendment Pertaining to the Harbor Maintenance Fee, 56 Fed. Reg. 21,445, 21,445 (May 9, 1991) (emphasis added).

Moreover, in <u>Swisher</u>, a case decided before Customs amended the regulation in 2001, we explained that 19 U.S.C. §§ 1514 and 1520(c) provide the only recognized avenue for an importer to seek refund of HMT paid on a non-quarterly basis:

> In fact, it is not at all clear that refunds on <u>import</u> duties, which comprise the vast majority of the money collected by Customs, would or could be requested outside of the bounds of the liquidation or reliquidation procedures. With regard to <u>imports</u>, most fees, including the HMT, are collected at liquidation. Any fee collected at liquidation is considered merged with the liquidation. <u>See</u> <u>Thomson Consumer Elec., Inc. v. United States</u>, 62 F. Supp. 2d 1182 (Ct. Int'l Trade

> 1999). A legal challenge to a liquidation decision <u>must</u> be made as a protest within 90 days of liquidation. <u>See</u> <u>Mattel Inc. v. United States</u>, 72 Cust. Ct. 257, 377 F. Supp. 955, 960 (Cust.Ct. 1974); 19 U.S.C. § 1514(c)(3)(A). A challenge based on a clerical error, or other factual mistake <u>must</u> be raised within one year of liquidation in a request of reliquidation. <u>See</u> 19 U.S.C. § 1520(c). Denial of a request for reliquidation under section 1520(c) is a protestable decision. <u>See</u> 19 U.S.C. § 1514(a)(7).

<u>Swisher Int'l, Inc. v. United States</u>, 205 F.3d 1358, 1368 n.8 (Fed. Cir. 2000) (emphases added). Former § 24.24(e)(5) therefore applied to quarterly payers, like the exporter in <u>Swisher</u>, and not to importers like Esso.

Accordingly, we hold that Esso cannot invoke the 1997 regulation to escape the regular protest procedures of 19 U.S.C. §§ 1514 and 1520(c).

C

Third, Esso argues that a Customs HQ telex, dated January 6, 1989, provided an alternative procedure for seeking HMT refunds. The telex was sent from the Assistant Commissioner for Inspection and Control to various port officials throughout the country, informing them of the 1988 statutory amendment and advising them that claimants could seek HMT refunds by submitting a request to Customs's National Finance Center. Esso makes much of the fact that the telex did not contain a time limit for requesting the refund. But neither did the telex specify how Customs officials were to handle these requests once received. The telex did not state that Customs officials were to treat HMT refund requests—particularly refund requests for import HMT—any differently from protest and reliquidation requests under 19 U.S.C. §§ 1514 and 1520(c). Given the brevity of the telex and its stated purpose of giving port officials a "synopsis" of the 1988 amendment, we are unwilling to read the telex as overriding existing statutory procedures for seeking refunds of import fees.

Moreover, to the extent that Esso argues that the telex is evidence of Customs's prior "treatment" of substantially identical transactions under 19 U.S.C. § 1625(c)(2), we note that Esso has not identified any actual instance in which Customs has refunded HMT payments upon an importer's request filed more than one year after liquidation, or that such treatment of otherwise untimely requests was "consistent and continuous." 19 C.F.R. § 177.9(e)(2) (1997) ("[A]n affected party must demonstrate to the satisfaction of the Customs Service that the treatment previously accorded by Customs to the substantially identical transactions was sufficiently consistent and continuous that such party reasonably relied thereon in arranging for future transactions."); see Motorola, Inc. v. United States, 509 F.3d 1368, 1371 (Fed. Cir. 2007) (holding that Customs may reasonably require an actual prior determination by a Customs officer regarding the facts and issues involved in the claimed treatment).

D

Fourth, Esso asks us to characterize the denial of its August 25, 1997 refund request as an "exaction," one which Esso timely protested under 19 U.S.C. § 1514(a)(3) (protest of "all charges or exactions of whatever character"). The government counters that Esso's theory would permit an importer to revive any untimely reliquidation request under § 1520(c) by simply filing a protest within ninety days of whatever date Customs denies the reliquidation request. In the government's view, to the extent there was any "charge or exaction," it was Esso's initial payment of HMT, which then merged into Customs's liquidation of the entries. At that point, according to the government, Esso could have filed a timely reliquidation request under § 1520(c), and the denial of such a

request would have been a protestable decision under § 1514(a)(7) (protest of "the refusal to reliquidate an entry under section 1520(c) of this title").

In support of its "exaction" theory, Esso relies on our decision in <u>Swisher</u>, which held that

> the denial of a request for refund is a protestable decision and thus can accrue a claim based on the alleged illegality of the exaction of the HMT even if the request, which <u>under the HMT regulation can be filed at any time</u>, is made after the two-year statute of limitations [of 28 U.S.C. § 2636(i) (1994)] has run on suing [in the Court of International Trade] over the act of payment of the tax.

205 F.3d at 1369 (emphasis added). As previously explained, the plaintiff in that case was a quarterly payer seeking refunds of export HMT under the quarterly refund procedure of 19 C.F.R. § 24.24(e)(5) (1998)—which at that time had no time limits—but which has never been available to importers, like Esso, who pay HMT upon formal entry. Because the quarterly payer in <u>Swisher</u> was permitted to file a refund request under former § 24.24(e)(5) at any time, there was no dispute in <u>Swisher</u> that its refund request was timely.

Nor was the timeliness of a refund request at issue in either <u>Eurasia</u> or <u>C. J. Tower</u>, the two other cases on which Esso relies. In <u>Eurasia</u>, the party seeking a refund of excess duties had originally requested the refund <u>before</u> Customs liquidated those entries. <u>Eurasia Imp. Co. v. United States</u>, 31 CCPA 202, 211-12 (1944) (holding that the denial of "a protest against the collector's refusal to refund excessive duties collected as a part of the estimated duties <u>before</u> liquidation" was a protestable decision under § 1514 (emphasis added)). Accordingly, there was no argument in <u>Eurasia</u> that the refund request was filed too late. In <u>C. J. Tower</u>, the version of § 1520(c)(1) existing at that time permitted reliquidation so long as the alleged mistake was "brought to the

attention of the customs service within one year after the date of entry." United States v. C. J. Tower & Sons of Buffalo, Inc., 499 F.2d 1277, 1279 (CCPA 1974) (quoting statute). The importer in C. J. Tower complied with this time limit (by letter dated November 14, 1966), id., and Customs's denial of this reliquidation request was held to be a protestable decision under § 1514, C. J. Tower, 499 F.2d at 1280. In sum, the claimants in Eurasia or C. J. Tower filed timely refund requests; here Esso did not. Absent any refund procedure other than those in §§ 1514 and 1520(c), Esso must comply with those statutes' time limits.

E

Fifth, and finally, Esso seeks to invoke equitable principles to toll the statutory time limits of 19 U.S.C. §§ 1514 and 1520(c). The trial court declined to grant this remedy because Esso "had the opportunity to protect itself by protesting or seeking reliquidation." Summary Judgment, slip op. at 5. Without deciding whether §§ 1514 and 1520(c) can ever be equitably tolled, we agree with the trial court that equitable tolling is not available to Esso in this case. The Supreme Court has warned that "[o]ne who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence," Baldwin County Welcome Ctr. v. Brown, 466 U.S. 147, 151 (1984), and "the principles of equitable tolling . . . do not extend to what is at best a garden variety claim of excusable neglect," Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990).

Esso's possession-to-possession shipments had been exempted from HMT on November 10, 1988—nearly five years before Esso submitted its first entry covered by the '59 protest. Esso failed to timely notify Customs of this overpayment because Esso, by its own admission, did not understand the relevance of the statutory exemption until

May 16, 1997—nearly four years <u>after</u> Esso had begun paying HMT that was not owed. Whether the underlying cause of these overpayments was Esso's ignorance of the governing statute, or Customs's longstanding failure to amend its regulations to reflect the statutory amendment, the error could have been avoided if Esso had simply consulted the statute. Equitable tolling cannot excuse this lack of diligence.

## II. The '57 and '58 Protests

On cross-appeal, the government challenges the trial court's ruling that Esso's overpayment of HMT on entries covered by the '57 and '58 protests, which Esso timely brought to Customs's attention within one year of liquidation, can be corrected under 19 U.S.C. § 1520(c)(1). Section 1520(c)(1) provides:

> (c) Reliquidation of entry.
>
> Notwithstanding a valid protest was not filed, the Customs Service may, in accordance with regulations prescribed by the Secretary, reliquidate an entry or reconciliation to correct--
>
> (1) <u>a clerical error, mistake of fact, or other inadvertence</u>, whether or not resulting from or contained in electronic transmission, <u>not amounting to an error in the construction of a law</u>, adverse to the importer and manifest from the record or established by documentary evidence, in any entry, liquidation, or other customs transaction, when the error, mistake, or inadvertence is brought to the attention of the Customs Service within one year after the date of liquidation or exaction . . . .

<u>Id.</u> (emphases added).

We have interpreted the two phrases emphasized above as setting forth separate requirements, both of which must be satisfied before an error can be corrected. "To fall within section 1520(c)(1)'s sphere of authority, a plaintiff is required first to prove that the error . . . is a 'clerical error, mistake of fact, or other inadvertence.'

. . . Second, the plaintiff must show that the error does not amount to a misconstruction of the law." G & R Produce Co. v. United States, 381 F.3d 1328, 1331 (Fed. Cir. 2004); see Ford Motor Co. v. United States, 157 F.3d 849, 857 (Fed. Cir. 1998) ("[F]or an error to be correctable, it must simultaneously qualify as at least one of the three enumerated types and not qualify as an 'error in the construction of a law.'").

For the reasons stated below, we hold as a matter of law that neither of the two statutory requirements has been satisfied and, therefore, reliquidation is not permitted under § 1520(c)(1).

A

Of the three recognized categories of error in § 1520(c)(1)—"clerical error, mistake of fact, or other inadvertence"—the trial court held that the error in this case was an "inadvertence." Summary Judgment, slip op. at 6. ("The error is certainly an inadvertence."); id. at 7 ("This is clearly a case of inadvertence.").

An "inadvertence" is "an oversight or involuntary accident, or the result of inattention or carelessness," Hambro Auto. Corp. v. United States, 603 F.2d 850, 854 (CCPA 1979) (quoting C.J. Tower, 336 F. Supp. at 1399, aff'd, 499 F.2d 1277 (CCPA 1974)), but "does not stretch so far as to encompass intentional or negligent inaction," Ford, 157 F.3d at 860. Similarly, an importer's "repetition of 'inadvertence' may indicate an advertent misunderstanding of the law" that cannot be corrected under § 1520(c)(1). Century Imps., Inc. v. United States, 205 F.3d 1308, 1313 (Fed. Cir. 2000). In both Ford and Century, we held that there was no "inadvertence," as a matter of law, where an importer had repeatedly and consistently made the same error in every one of its entries over an extended period of time. In Ford, an importer consistently designated its

merchandise as "non-privileged domestic" instead of "privileged domestic," and did so for each of its eleven entries during a three-month period. 157 F.3d at 853. We affirmed the trial court's grant of summary judgment insofar as the error was not an "inadvertence." Id. at 861 (stating that if the importer's "characterization of the facts is correct, [the broker's] mistake might qualify as a 'clerical error,' but not as an 'inadvertence.'"). In Century, an error was repeated in all four of the importer's entries over a four-month period. 205 F.3d at 1312-13. In particular, the importer failed to mark its entries "duty paid" for purposes of determining the goods' transaction value. Id. at 1312. Because the importer's "repeated failures . . . over a period of at least four months" constituted either a "misapprehension of the law" or simple negligence, we reversed the trial court's summary judgment ruling that this error was an "inadvertence." Id. at 1313.

Here, Esso paid HMT on all eighty-seven of its entries between 1993 and 1997. Eighteen of those entries are at issue here in the '57 and '58 protests. Those eighteen entries were entered between June 28, 1995 and March 19, 1997—a period of over twenty months. The numbers alone suggest that Esso's error is more overt than those in Ford (eleven entries in three months) and Century (four entries in four months). More importantly, however, Esso paid this HMT based on an "advertent misunderstanding of the law," believing that Customs's outdated regulations accurately reflected the state of the law after the 1988 statutory amendment. Century, 205 F.3d at 1313. As in Ford and Century, we hold that Esso's knowing, repeated, and consistent HMT payments are not an "inadvertence" under § 1520(c)(1).

The trial court apparently reasoned that Esso's misapprehension of the law is offset by that of Customs. Summary Judgment, slip op. at 8 ("[T]he onus must fall on Customs. It is simply inexcusable for the master of the Customs laws to fail for almost a decade to amend the applicable regulation that governs the conduct of port officials in collecting HMT and to continue to authorize incorrect software."). But § 1520(c)(1) permits the correction of errors whether committed by the importer, by Customs, or both. See G & R Produce, 381 F.3d at 1332 ("[A] mistake of fact need only be made by either Customs or the importer."); Ford, 157 F.3d at 857 (stating that § 1520(c)(1) "allows the correction of errors made not only by employees of Customs, but also by employees of an importer"). Conversely, an error is not an "inadvertence" if it is the result of negligent inaction or an advertent misunderstanding of the law, regardless if the inaction or misunderstanding was originally the fault of Customs or the importer. Whether the fault lay in Customs's decades-long failure to update its regulations, or in Esso's repeated payment of HMT on all eighty-seven of its entries, or in Customs officials' reliance on outdated regulations when liquidating those entries, the error remains one of negligent inaction or legal misunderstanding. Such an error cannot be characterized as an "inadvertence."

We also reject the argument that the error can be classified as a "mistake of fact." "A mistake of fact occurs when either: '(1) the facts exist, but are unknown, or (2) the facts do not exist as they are believed to.'" G & R Produce, 381 F.3d at 1331 (quoting Hambro, 603 F.2d at 855). Esso accurately understood all facts necessary to make a legal determination as to whether it owed HMT. Esso knew the dates of its entries. It knew that its merchandise consisted of petroleum products, not "crude oil

with respect to Alaska" under 26 U.S.C. § 4462(b)(2). It also knew that those products were loaded on a vessel in the U.S. Virgin Islands and unloaded for ultimate use or consumption in Puerto Rico. Those are all the facts that an importer needs in order to determine that no HMT is owed under § 4462(b). With full knowledge of those facts, Esso then applied the pre-1988 version of the law to reach an erroneous legal conclusion. This was a mistake of law, not a "mistake of fact" under § 1520(c)(1). Moreover, and contrary to Esso's argument, the fact that Congress amended the law in 1988 is not a "fact" for purposes of § 1520(c)(1) because importers are "presumed to know the law." V. Casazza & Bro. v. United States, 25 CCPA. 184, 188 (1937) ("The importers were presumed to know the law and they cannot now successfully contend that they were authorized in law to import the distilled spirits . . . ."); Schrikker v. United States, 13 Ct. Cust. 562, 565 (1926) ("Importers, whatever their nationality, must be presumed to know and are bound by the customs laws of the countries with which they are dealing.").

In this regard, Esso's payment of HMT under an outdated law, with full knowledge of the relevant facts, is similar to an importer's use of the wrong accounting method in Hambro. There, the importer used its home-market expenses and profits rather than its export-market expenses and profits to determine its statutory cost of production under 19 U.S.C. § 1402a(f) (1976). Hambro, 603 F.2d at 854. In requesting relief, the importer asserted that this error constituted a mistake of fact. Id. We rejected this argument, noting that the importer had "full knowledge" of its general expenses and profits in both the home market and export market, but chose the wrong country's data in making its calculations. Id. at 855. As such, the error was not a mistake in knowing

the relevant facts, but in applying § 1402a(f) to those facts—a classic mistake of law. Like the importer in Hambro, Esso knew the facts but did not know the consequences of those facts under § 4462(b).

Finally, we note that Esso has not argued that its HMT payments were due to a "clerical error." Nor do we see any. A "clerical error" occurs when "a subordinate act[s] contrary to binding instructions." Ford, 157 F.3d at 860. Esso has never suggested that it instructed a subordinate to withhold HMT on entries covered by the '57 and '58 protests. To the contrary, Esso genuinely believed that HMT was owed under Customs's outdated regulations. For this reason, the error could not have been a "clerical error."

B

Even if the first requirement of § 1520(c)(1) were satisfied, Esso must also show that its error did "not amount[ ] to an error in the construction of a law." Id.; see Ford, 157 F.3d at 857 ("[T]he statute contemplates that some errors that are prima facie correctable will also be 'error[s] in the construction of a law.' The statute precludes that subset of errors from correction." (second alteration in original)). The trial court held that the error here did not run afoul of the "construction of law" proviso because, according to the trial court, "No one construed the law. The statute was clear." Summary Judgment, slip op. at 7 ("No judgment about the law to be applied or its interpretation was made.").

The phrase "construction of a law" is not limited to cases involving a disputed interpretation of a legal provision. To the contrary, we have explained that "'an error in the construction of a law' is the same as a 'mistake of law.'" Ford, 157 F.3d at 859

(citing Hambro, 603 F.2d at 854). "An error in the construction of the law occurs when the facts are known, but the legal significance of those facts is not appreciated." G & R Produce, 381 F.3d at 1332. Here, Esso correctly understood all facts necessary to apply 19 U.S.C. § 4462(b); its mistake was in failing to appreciate the legal consequences of those facts under the current version of the statute. Esso admits that it first learned of the 1988 amendment on May 16, 1997, when "it came to our attention for the first time that commercial cargo shipped by vessel from the U.S. Virgin Islands to the port of San Juan, Puerto Rico . . . was no longer subject to the payment of Harbor Maintenance Tax." App. for Defendant-Cross Appellant at 40. Esso was ignorant of the law, and "ignorance of the law does not qualify as a correctable inadvertence under § 1520." Century, 205 F.3d at 1313.

## CONCLUSION

For the foregoing reasons, we conclude that the Court of International Trade correctly determined that the '59 protest was time-barred because Esso notified Customs of its excess HMT payments more than one year after liquidation. However, we conclude that as to the '57 and '58 protests, the Court of International Trade erred in determining that Esso's excess HMT payments were the result of a correctable error under 19 U.S.C. § 1520(c). Accordingly, the decision of the Court of International Trade is

### AFFIRMED-IN-PART and REVERSED-IN-PART.

## COSTS

No costs.